# EXHIBIT A

## Service of Process Transmittal Summary

**TO:**     John Raleigh, General Counsel
Learfield Communications
505 HOBBS RD
JEFFERSON CITY, MO 65109-5788

**RE:**     **Process Served in California**

**FOR:**    Bulldog Sports Properties, LLC  (Domestic State: MO)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | THE CALIFORNIA STATE UNIVERSITY, FRESNO ATHLETIC CORPORATION, a California public benefit nonprofit corporation vs. BULLDOG SPORTS PROPERTIES, LLC |
| **CASE #:** | 23CECG00768 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 03/08/2023 at 09:08 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification, John Raleigh  jraleigh@learfield.com |
| | Email Notification, Katie Worden  kworden@learfield.com |
| | Email Notification, Sterling Hawkins  sterling.hawkins@learfield.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System
330 N BRAND BLVD
STE 700
GLENDALE, CA 91203
866-331-2303
CentralTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                       Wed, Mar 8, 2023
**Server Name:**           Arturo Ruiz

| Entity Served | BULLDOG SPORTS PROPERTIES LLC |
|---|---|
| Case Number | 23CECG00768 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr>
<td>

**NOTICE TO DEFENDANTS:**
*(AVISO AL DEMANDADO):*
BULLDOG SPORTS PROPERTIES, LLC DBA BULLDOG SPORTS
PROPERTIES, a Missouri limited liability company, and DOES 1 to 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
THE CALIFORNIA STATE UNIVERSITY, FRESNO ATHLETIC
CORPORATION, a California public benefit nonprofit corporation

</td>
<td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

E-FILED
3/7/2023
Superior Court of California
County of Fresno
By: I. Herrera, Deputy

</td>
</tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr>
<td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Fresno Superior Court
B.F. Sisk Courthouse
1130 O. Street
Fresno, CA 93721-2220

</td>
<td>

**CASE NUMBER:**
*(Número del Caso):*
23CECG00768

</td>
</tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jerrold Abeles (SBN 138464) Jessica B. Do (SBN 317517)
ARENTFOX SCHIFF LLP
555 West Fifth Street, 48th Floor, Los Angeles, CA  90013 (213) 629-7400

DATE: 3/7/2023                                    Clerk, by /s/ I. Herrera                , Deputy
*(Fecha)*                                         *(Secretario)*                            *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Bulldog Sports Properties, LLC DBA Bulldog Sports Properties, a Missouri limited liability company
   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1  JERROLD ABELES (SBN 138464)
   jerry.abeles@afslaw.com
2  JESSICA B. DO (SBN 317517)
   jessica.do@afslaw.com
3  **ARENTFOX SCHIFF LLP**
   555 West Fifth Street, 48th Floor
4  Los Angeles, CA 90013
   Telephone:    213.629.7400
5  Facsimile:    213.629.7401

6  Attorneys for Plaintiff
   THE CALIFORNIA STATE UNIVERSITY, FRESNO
7  ATHLETIC CORPORATION

E-FILED
3/1/2023 12:11 PM
Superior Court of California
County of Fresno
By: April Hoffman, Deputy

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                          COUNTY OF FRESNO

| | |
|---|---|
| 11  THE CALIFORNIA STATE UNIVERSITY, FRESNO ATHLETIC CORPORATION, a California public benefit nonprofit corporation,<br><br>13  Plaintiff,<br><br>14  v.<br><br>15  BULLDOG SPORTS PROPERTIES, LLC DBA BULLDOG SPORTS PROPERTIES, a Missouri limited liability company, and DOES 1 to 50, inclusive;<br><br>17  Defendants. | Case No. 23CECG00768<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT; AND**<br>**(2) DECLARATORY RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

19        Plaintiff The California State University, Fresno Athletic Corporation alleges for its

20  Complaint against Defendants Bulldog Sports Properties, LLC dba Bulldog Sports and Does 1 to

21  50, inclusive, as follows:

22                              **INTRODUCTION**

23        1.      Plaintiff and Defendant are parties to a multi-year, Multi-Media Rights

24  Agreement that granted Defendant the exclusive right to sell advertising and obtain

25  sponsorships for Plaintiff's intercollegiate sports teams in exchange for an annual "Guaranteed

26  Rights Fee." The Guaranteed Rights Fee is a specific sum agreed upon by the parties to be paid

27  to Plaintiff for each athletic year for the duration of the Multi-Media Rights Agreement. In June

28  2022, Defendant breached the contract by paying $1.2 million *less* than the Guaranteed Rights

ARENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

AFDOCS:26715972

COMPLAINT

1  Fee owed for the 2021-2022 athletic year. Defendant provided no advance written

2  communication that it would short-pay Plaintiff by approximately 90% of the $1,347,500 owed

3  by June 30, 2022. Defendant not only refused to pay the entire guaranteed amount for that year,

4  but indicated that it had the right to short-pay the guaranteed amounts owed for subsequent

5  athletic years. Plaintiff gave Defendant notice of breach and provided an opportunity to cure,

6  but Defendant refused to even acknowledge a breach. For these reasons, Plaintiff seeks

7  damages for Defendant's breach, and a judicial declaration that should the contract remain in

8  effect, Defendant must pay the amount that it guaranteed for all ensuing contract years.

9                                          **PARTIES**

10        2.       Plaintiff The California State University, Fresno Athletic Corporation

11  ("Plaintiff") is a California public benefit nonprofit corporation, with its principal place of

12  business on the campus of California State University, Fresno.

13        3.       Defendant Bulldog Sports Properties, LLC dba Bulldog Sports Properties

14  ("Defendant") is a Missouri limited liability company that has conducted or is currently

15  conducting business in the County of Fresno, California. Upon information and belief,

16  Defendant is wholly owned by Learfield Communications, LLC, a Delaware limited liability

17  company.

18        4.       Plaintiff is presently unaware of the true names and capacities of the defendants

19  sued herein as Does 1 to 50, inclusive, and therefore sues such defendants by their fictitious

20  names. Plaintiff will seek leave to amend this Complaint to allege the true names and capacities

21  of such defendants when they are ascertained. On information and belief, Plaintiff alleges that

22  that each of the fictitiously-named defendants is responsible in some manner for the injury

23  suffered by Plaintiff.

24        5.       On information and belief, Plaintiff alleges that, at all times mentioned herein,

25  Defendant Bulldog Sports Properties, Learfield Communications, LLC, and each of the Doe

26  defendants was acting as the employee, agent, principal, officer, partner, joint venturer,

27  director, alter ego, or other representative of one or more of the remaining defendants and, in

28  committing the acts and/or omissions alleged herein, was acting within the scope and course of

RENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

1    such employment, agency, partnership, joint venture, alter ego, or other relationship, and with

2    the knowledge and consent of the remaining defendants.

3                             **JURISDICTION AND VENUE**

4         6.       This Court has jurisdiction over this matter and the parties pursuant to California

5    Code of Civil Procedure Section 410.10 *et seq.* for the parties entered into the relevant contract

6    in California and it was to be performed in California. The parties also agreed to California

7    jurisdiction in Section 6.2 of the Agreement (as defined below), which provides, "This

8    Agreement will be construed under California law (without regard for choice of law

9    considerations). … Courts located in the State of California shall have exclusive jurisdiction

10    over any disputes relative to this Agreement."

11         7.       Pursuant to California Code of Civil Procedure Section 395(a), venue is proper

12    in Fresno County because it is the county in which Defendant is contracted to perform its

13    obligations and the county where the Agreement was entered into.

14                              **FACTUAL ALLEGATIONS**

15       A.      **The Agreement and its Amendments**

16         8.       On or about July 1, 2004, the parties entered into a Multi-Media Rights

17    Agreement. Pursuant to that contract, Plaintiff granted Defendant exclusive sales and marketing

18    rights to inventory, including but not limited to, publication, advertising, signage, and other

19    promotional rights for Plaintiff's intercollegiate sports and more. In return, Defendant agreed to

20    pay an agreed-upon "Guaranteed Rights Fee" for each athletic year for the duration of the

21    contract. In 2006, the parties extended the contract term through a First Amendment.

22         9.       On or about July 1, 2008, the parties entered into an Amended and Restated

23    Multi-Media Rights Agreement (the "Agreement"). A true and correct copy of the Agreement

24    is attached hereto as Exhibit A.

25         10.      The Agreement was executed "in order to set forth new terms and conditions

26    relating to the rights and obligations [of the parties] in connection with the 'Multi-Media

27    Rights' … relating to [Plaintiff's] intercollegiate athletic programs." (Exh. A, § C.) Thus, the

28    Agreement replaced all prior versions in their entirety. (*Id.* at § D.)

1      11.    The Agreement provided Defendant with extensive and lucrative "Multi-Media

2   Rights," for which Defendant retained all revenues it generated other than those to be paid to

3   Plaintiff as a Guaranteed Rights Fee. The Agreement defined the broad term "Multi-Media

4   Rights" as follows:

> [T]he exclusive sales and marketing rights, as hereinafter set forth,
> with exceptions as set forth within, to inventory, including, but not
> limited to, print, media, advertising, sponsorships, existing or new
> signage not already contracted to other parties, and other promotional
> and sponsorship rights for football, men's and women's basketball
> games and other intercollegiate sports; existing or new temporary or
> permanent and promotional rights for home basketball games and all
> games played at neutral venues where University is designated as the
> home team; temporary and permanent signage and promotional
> rights for all University home football games (and all games played
> at neutral venues where University is designated as the home team);
> radio play-by-play broadcast rights and coaches' shows and selected
> television broadcast rights for football and men's and women's
> basketball; official athletic website sponsorship; and any other
> sponsor-related or promotional rights to University's athletic
> programs that may be subsequently agreed to between the Parties.

14     12.    Defendant did not, of course, receive Plaintiff's expansive Multi-Media Rights

15  for free. Rather, in exchange it guaranteed Plaintiff a fixed, consistent and guaranteed revenue

16  stream, payable in good times and bad. Defendant alone would receive the revenues that

17  exceeded the amounts guaranteed to Plaintiff. Section 4.1 of the Agreement provides for

18  Defendant's obligation to pay Plaintiff an annual Guaranteed Rights Fee in exchange for the

19  Multi-Media Rights as follows:

> As payment for rights granted under this Agreement, [Defendant]
> will pay [Plaintiff] a Guaranteed Rights Fee in such amounts as set
> forth below. [. . .] All Guaranteed Rights Fees owed by [Defendant]
> shall be paid one-half on December 31 and one-half on June 30 of
> each Athletic Year ....

23     13.    The Agreement includes a schedule providing for the Guaranteed Rights Fee for

24  each Athletic Year from 2008 through 2019. (Exh. A, § 4.1.) Each "Athletic Year" starts on

25  July 1 and ends on June 30. (*Id.* at § 1.1.)

26     14.    Between 2011 and 2012, the parties executed Third and Fourth Amendments to

27  the Agreement. The terms of those amendments are not material to the issues in this case, so

28  are not attached as exhibits.

RENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

1    15.    In March 2015, the parties executed a Fifth Amendment to the Agreement to

2    "extend the Term and provide for a capital subsidy that [Defendant] will pay to the University

3    over the Term . . . ." A true and correct copy of the Fifth Amendment is attached hereto as

4    Exhibit B. While the Agreement was set to expire after the 2018-2019 Athletic Year, the Fifth

5    Amendment extended the Agreement through the 2025-2026 Athletic Year, and specified the

6    Guaranteed Rights Fee to be paid to Plaintiff for each Athletic Year.

7    16.    Two significant events occurred in 2020 and 2021 that resulted in the execution

8    of a further amendment, the sixth, to the Agreement. First, the COVID-19 pandemic spread

9    across the world. In March 2020, the National Collegiate Athletic Association cancelled all

10    collegiate sports competitions. At the same time, state and local governments issued stay-at-

11    home orders, precluding participation in, among other events, college sports. Second, Plaintiff

12    entered into an exclusive healthcare marketing agreement with a healthcare provider, such that

13    Defendant's ability to sell advertising to healthcare providers was limited.

14    17.    As a result of these two events, the parties re-negotiated various contract terms

15    and, on or about February 1, 2021, executed a Sixth Amendment to the Agreement. The Sixth

16    Amendment expressly addressed two matters: (1) the COVID-19 pandemic and its financial

17    impact on intercollegiate athletic competitions during the 2020-2021 Athletic Year, and (2)

18    Plaintiff's reassignment of the multi-media rights for healthcare-related organizations to

19    another entity. These negotiations resulted in material reductions in the Guarantees Rights Fees

20    to be paid to Plaintiff for the ensuing five years. A true and correct copy of the Sixth

21    Amendment is attached hereto as Exhibit C.

22    18.    The annual Guaranteed Rights Fees set forth in the Fifth Amendment, and the

23    reduced Guaranteed Rights Fees set forth in the Sixth Amendment, are as follows:

| Athletic Year | Guaranteed Rights Fee (Fifth Amendment – Exh. B) | Guaranteed Rights Fee (Sixth Amendment – Exh. C) |
| --- | --- | --- |
| 2020-2021 | $3,095,000 | (Refer to Section 5.1a below) |
| 2021-2022 | $3,245,000 | $2,695,000 |
| 2022-2023 | $3,395,000 | $2,790,000 |
| 2023-2024 | $3,545,000 | $2,879,500 |
| 2024-2025 | $3,695,000 | $2,879,500 |
| 2025-2026 | $3,845,000 | $2,879,500 |

RENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

19.     Based on the parties' negotiations and ultimate agreement (in the Sixth Amendment), Plaintiff accepted a reduction of more than $3,600,000 in <u>Guaranteed</u> Rights Fees to accommodate the impacts of COVID-19 and Plaintiff's exclusive marketing arrangement with a healthcare provider.

20.     The annual Guaranteed Rights Fee is to be paid in equal amounts on or before December 31 and on or before June 30 of each Athletic Year. As noted above, for the 2021-2022 Athletic Year, the total Guaranteed Rights Fee was $2,695,000, so $1,347,500 (50%) was due on December 31, 2021. Defendant made that payment on time and in full.

21.     Defendant was to pay the second half of the Guaranteed Rights Fee for that Athletic Year, $1,347,500, on or before June 30, 2022. Of this amount, $220,855 was paid to Plaintiff by one of Plaintiff's auxiliary organizations. As such, the balance due from Defendant is $1,126,645.

**B.      Defendant's Breach**

22.     On or about June 29, 2022, Defendant tendered a "Rights Fee" check to Plaintiff in the amount of $106,645. This check was far less than the required $1,126,645. At no time prior to tendering the check in June 2022 did Defendant advise that it would not pay the full Guaranteed Rights Fee. A true and correct copy of the June 2022 Check, with certain bank account information redacted, is attached hereto as Exhibit D.

23.     Despite Plaintiff's repeated demands, Defendant has not made any subsequent payments to satisfy the balance due on this Guaranteed Rights Fee and continues to maintain that it had the absolute right to pay less than the guaranteed amount. Plaintiff never cashed the June 2022 check. Thus, the total amount of $1,126,645 remains outstanding.

24.     While Section 4.3 of the Agreement provides a method for a reduction of the Guaranteed Rights Fee in appropriate circumstances – none of which are applicable – even if reduction was appropriate it had to be "agreed upon" by the parties and "negotiated in good faith." (Exh. A, § 4.3.) In the instant situation, Defendant imposed the reduction unilaterally, without notice or discussion. The parties did not agree to any reduction of the Guaranteed Rights Fee for the 2021-2022 Athletic Year. Simply put, Defendant decided unilaterally to

1    reduce the Guaranteed Rights Fee -- and keep more than $1,200,000 for itself -- without any

2    contractual or legal basis.

3        25.     Section 4.3 of the Agreement outlines seven specific scenarios in which the

4    parties will agree upon a reduction or re-negotiation of the Guaranteed Rights Fee. None of the

5    situations apply here. Those scenarios are as follows:

6            a.  The football, basketball or baseball teams are sanctioned and prevented from

7                appearing in conference championship or post-season tournaments or bowl

8                games.

9            b.  The football, basketball or baseball programs are no longer in the Western

10               Athletic Conference or another conference.

11           c.  One of the major athletic programs (football, basketball, or baseball) is

12               eliminated or substantially curtailed.

13           d.  An act of terrorism, epidemic or natural disaster prevents a home or neutral

14               site game from being played.

15           e.  Defendant "is not permitted to sell any and all categories of sponsorship not

16               specifically prohibited herein, to sell to any and all sponsors, and to continue

17               to sell all inventory managed or sold by [Defendant] at any time during the

18               Term of this Agreement (collectively the 'Contract Categories')." In that

19               scenario, if Defendant "is ever prevented from selling any Contract

20               Categories not specifically prohibited herein for any reason through no fault

21               of [Defendant] (fault being limited to a sponsor no longer wishing to be a

22               sponsor), a dollar-for-dollar credit and reduction in the amount of revenue

23               lost from any contract or revenue received within the Contract Categories

24               shall be made from the Guaranteed Rights Fee in recognition of

25               [Defendant's] loss of revenue."

26           f.  Defendant is prevented from selling sponsorships in the same manner in

27               which it has historically been provided.

28

RENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

g. Should any other event described in the Agreement that allows for reduction of the Guaranteed Rights Fee occur.

26. Defendant does not contend that six of the scenarios ever arose, so there are no issues regarding whether Plaintiff's athletic teams participated in all scheduled athletic events, were suspended from post-season play, left the Western Athletic Conference, or prevented Defendant from selling sponsorships as it had during the prior years.

27. Defendant instead relies on a single scenario, (e) above. In fact, though, Defendant has been permitted to "sell any and all categories of sponsorship not specifically prohibited" and continued "to sell all inventory managed or sold by [Defendant]" throughout the 2021-2022 Athletic Year. Defendant admitted that it not only continued to sell just as it had previously, but even attracted 35 new sponsors during that Athletic Year. Even though Defendant was solely responsible for sales and there were no impairments by Plaintiff on Defendant's rights or abilities to sell, Defendant nevertheless seeks to shift its burden of a diligent sales effort to Plaintiff by imposing on Plaintiff "a dollar-for-dollar credit and reduction in the amount of revenue lost from any contract or revenue received within the Contract Categories shall be made from the Guaranteed Rights Fee in recognition of [Defendant's] loss of revenue . . . ." This is an invalid basis for withholding guaranteed payments from Plaintiff.

28. Any suggestion that Defendant's lost revenue during the 2021-2022 Athletic Year or subsequent Athletic Years was due to the COVID pandemic was addressed when the parties agreed to significant reductions in the annual Guaranteed Rights Fees reflected in the Sixth Amendment. Indeed, if Plaintiff had known that Defendant would still unilaterally withhold additional amounts based on COVID impacts after Plaintiff had already agreed to a $550,000 reduction in the 2021-2022 Athletic Year Guaranteed Rights Fee *and* more than $3,000,000 in additional reductions in subsequent years,, Plaintiff never would have agreed to the reductions reflected in the Sixth Amendment.

29. After Defendant's failure to make the June 2022 Guaranteed Rights Fee, Plaintiff conferred multiple times with Defendant in good faith by telephone, e-mail, and letters

1   in an attempt to obtain rightful payment of the 2021-2022 Athletic Year Guaranteed Rights

2   Fee.

3       30.     In response to Plaintiff's questions as to why Defendant unilaterally and

4   drastically underpaid the Guaranteed Rights Fee, Defendant responded that it was based on

5   "impairments" as a result of the COVID-19 pandemic, specifically that Defendant was not able

6   to sell as much advertising and sponsorships post-pandemic as it did for the 2019-2020 Athletic

7   Year. For this reason, Defendant unilaterally imposed a dollar-for-dollar reduction in the

8   amount it paid Plaintiff. A true and correct copy of Defendant's August 26, 2022 email to

9   Plaintiff with attachments is attached hereto as Exhibit E. However, as outlined above,

10  Defendant's concept of "impairment" is without a contractual basis, for Defendant had no right

11  to unilaterally reduced the Guaranteed Rights Fee and pocket the reduction as its profits. The

12  Parties already considered, negotiated, and reduced the Guaranteed Rights Fee in the Sixth

13. Amendment to account for the pandemic and the termination of healthcare as a category of

14  sponsorship, and Plaintiff did not agree to any further reductions. There is thus no legal or

15  contractual basis for Defendant's wrongful withholding of a significant portion of the 2021-

16  2022 Guaranteed Rights Fee.

17      31.     Based on Defendant's repeated refusal to resolve the nonpayment, on October 3,

18  2022, Plaintiff sent Defendant a letter providing notice of breach and termination for cause due

19  to Defendant's failure to comply with its payment obligations under Section 4.1. In the letter,

20  Plaintiff notified Defendant that, pursuant to Section 6.4 of the Agreement, it had 90 days to

21  cure its breach by paying $1,347,500. Plaintiff also reminded Defendant that it is obligated to

22  continue paying the Guaranteed Rights Fee for 2022-2023 during the cure period. The 90-day

23  cure period expired on Sunday, January 1, 2023, but Defendant did not pay the amount owed.

24  A true and correct copy of Plaintiff's October 3, 2022 letter is attached hereto as Exhibit F.

25      32.     On October 19, 2022, Defendant responded to Plaintiff's notice of breach and

26  termination by claiming that Plaintiff had no right to terminate the Agreement. Defendant

27  asserted that a "dollar-for-dollar" reduction of the Guaranteed Rights Fee was warranted under

28  Section 4.1 of the Agreement due to the ongoing financial effects related to the COVID-19

RENTFOX SCHIFF LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

1   pandemic. Defendant also proclaimed – incorrectly – that this reduction "applies to any

2   Athletic [Y]ear in which there is a revenue impact." Based on Defendant's calculations of

3   expected revenues in future years, which were unlikely to reach pre-pandemic levels, it was

4   apparent that Defendant intended to withhold further Guaranteed Rights Fee payment for all

5   subsequent Athletic Years. Defendant never explained why or how its rationale qualifies as a

6   contractual basis for its unilateral withholding more than one million dollars and paying only

7   $106,545. A true and correct copy of Defendant's October 19, 2022 letter is attached hereto as

8   Exhibit G.

9       33.     On November 1, 2022, Plaintiff responded by letter plainly stating that

10  Defendant's response "ignored those portions of the Sixth Amendment to the Contract that

11  preclude the unilateral withholding" of the full 2021-2022 Athletic Year Guaranteed Rights

12  Fee. While Defendant insisted that the parties negotiate a resolution, Plaintiff outlined three

13  "ground rules" for further discussions with Defendant: (1) the cure period for the Notice of

14  Termination will continue to run and will not be extended; (2) Defendant will propose a plan

15  for how it will provide Plaintiff with the withheld funds; and (3) Defendant will confirm that it

16  will not make any unilateral deductions for future Guaranteed Rights Fees for the remainder of

17  the contract term. A true and correct copy of Plaintiff's November 1, 2022 letter is attached

18  hereto as Exhibit H.

19      34.     On November 1, 2022, shortly after receiving Plaintiff's letter, Defendant

20  responded by e-mail and asserted that because there was no breach of the Agreement, "there is

21  nothing to cure." Defendant further stated it was "not clear" why it would pay more to Plaintiff.

22  Defendant also refused to confirm that there would be no further unilateral reductions of the

23  Guaranteed Rights Fee in subsequent Athletic Years. A true and correct copy of Defendant's

24  November 1, 2022 e-mail is attached hereto as Exhibit I.

25      35.     During these exchanges, Defendant made clear that this improper and unilateral

26  action was Defendant's modus operandi. In its correspondence, Defendant pronounced that it

27  had reduced the contractual amounts owed to "dozens and dozens" of its other university

28  partners, and insisted that Plaintiff agree to a negotiated reduction in the amount Defendant

1    owed. (Exh. G.) A similar sentiment was repeated in Defendant's November 1, 2022 e-mail, its

2    last communication on the subject. (Exh. I.)

3          36.     To date, Defendant has not provided any further payment towards the

4    $1,020,000 short-pay owed on the 2021-2022 Athletic Year Guaranteed Rights Fee. Because

5    Plaintiff never cashed the check, the total amount of $1,126,645 remains due and outstanding.

6                            **FIRST CAUSE OF ACTION**

7                            **BREACH OF CONTRACT**

8                            **(Against All Defendants)**

9          37.     Plaintiff incorporates herein by this reference as though fully set forth each and

10    every allegation contained in paragraphs 1 through 36 of this Complaint.

11          38.     Plaintiff and Defendant entered into the Agreement on or about July 13, 2009,

12    and it was amended multiple times since.

13          39.     Pursuant to the Agreement, Plaintiff provided Defendant with the exclusive right

14    to sell advertising and obtain sponsorships for its intercollegiate sports teams in exchange for

15    payment of an annual Guaranteed Rights Fee.

16          40.     The parties subsequently executed the Sixth Amendment to the Agreement for

17    the stated purpose of accounting for the financial impact of the COVID-19 pandemic on

18    intercollegiate sports and the termination of healthcare as a category of sponsorship under the

19    Agreement. The Sixth Amendment reduced the Guaranteed Rights Fee for the 2022-2023

20    Athletic Year and all subsequent Athletic Years. As a result, Defendant owed the reduced

21    guaranteed fee of $1,347,500 by June 30, 2022.

22          41.     Because one of Plaintiff's auxiliary organizations paid $220,855 of the

23    guaranteed fee, the balance due to be paid by Defendant is $1,126,645.

24          42.     Plaintiff performed all conditions and promises required of it under the

25    Agreement except for those it was prevented from performing due to Defendant's conduct.

26          43.     Defendant materially breached the Agreement by failing to pay the full amount

27    of $1,126,645 due and owing to Plaintiff by June 30, 2022, and Defendant was harmed as a

28    result.

44.     Plaintiff has demanded that Defendant make the payment due and owing, and gave Defendant notice of its contractual 90-day cure period.

45.     Despite Plaintiff's demands, Defendant refused to make the payment due and owing and did not cure its breach within the contractual cure period.

46.     Accordingly, Defendant is liable to Plaintiff in an amount to be determined at trial but not less than $1,126,645 plus accrued interest, costs, and attorneys' fees to the extent permitted by contract or by law.

## SECOND CAUSE OF ACTION

## DECLARATORY RELIEF

### (Against All Defendants)

47.     Plaintiff incorporates herein by this reference as though fully set forth each and every allegation contained in paragraphs 1 through 36 of this Complaint.

48.     An actual controversy has arisen and now exists between Plaintiff and Defendant concerning their respective rights and obligations under the Agreement and its amendments.

49.     Plaintiff contends that Defendant is obligated to pay Plaintiff the Guaranteed Rights Fee in the amounts set forth in the Sixth Amendment, which includes the sum of $1,126,645 that was due June 30, 2022, and precludes Defendant from unilaterally reducing guaranteed payments owed in subsequent years.

50.     Plaintiff is informed and believes that Defendant contends that it is not obligated to pay Plaintiff the Guaranteed Rights Fee outlined in the Sixth Amendment and may instead pay a reduced amount due to alleged "challenges" it is purportedly still experiencing because of the COVID-19 pandemic, and could be entitled to pay Plaintiff less than the stated Guaranteed Rights Fees for future Athletic Years. Plaintiff disputes these contentions on the ground that there is no contractual or legal basis for Defendant's unilateral withholding of the agreed-upon guaranteed sums. Plaintiff further disputes these contentions on the ground that the Sixth Amendment expressly considered the financial impact of the COVID-19 pandemic as part of

1   the Parties' agreement to reduce the annual Guaranteed Rights Fee, and thereby precludes

2   Defendant from making further unilateral reductions.

3      51.     Plaintiff desires a judicial determination of the parties' respective rights and

4   duties, and a declaration that Defendant is obligated to pay Plaintiff the guaranteed amounts

5   outlined in Section III of the Sixth Amendment, including the $1,126,645 sum that was due

6   June 30, 2022, and the stated amounts for all subsequent contract years, without reduction

7   based on COVID-19 effects.

8      52.     A judicial determination is necessary and appropriate at this time so that

9   Plaintiff may ascertain its rights with respect to performance under the Agreement and its

10  Amendments.

11                          **JURY TRIAL DEMAND**

12     Plaintiff hereby demands a trial by jury.

13                          **PRAYER FOR RELIEF**

14     WHEREFORE, Plaintiff The California State University, Fresno Athletic Corporation

15  respectfully requests that the Court enter judgment in favor of Plaintiff and against Defendant as

16  follows:

17     1.     For monetary damages in an amount to be determined at trial but not less than

18            $1,126,645;

19     2.     For an order declaring that Defendant is obligated to pay Plaintiff the sums

20            outlined in Section III of the Sixth Amendment to the Agreement without

21            reduction due to COVID-19, including the $1,126,645 sum that was due on or

22            before June 30, 2022;

23     3.     For pre-judgment interest on all damages incurred;

24     4.     For costs of suit incurred herein;

25     5.     For reasonable attorneys' fees to the extent permitted by contract or law; and

26     6.     For such other and further relief as the Court deems just and proper.

27

28

1    Dated: March 1, 2023                    **ARENTFOX SCHIFF LLP**

2

3                                            By: _____

4                                            Jerrold Abeles
                                             Jessica B. Do
5                                            Attorneys for Plaintiff
                                             THE CALIFORNIA STATE
6                                            UNIVERSITY, FRESNO ATHLETIC
                                             CORPORATION

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# AMENDED AND RESTATED
## MULTI-MEDIA RIGHTS AGREEMENT

This Amended and Restated Multi-Media Rights Agreement ("Agreement") is made and entered into by and between Bulldog Sports Properties, LLC d/b/a Bulldog Sports Properties ("BSP") a single member limited liability company wholly owned by Learfield Communications, Inc., and California State University, Fresno Athletic Corporation ("University").

## BACKGROUND TO AGREEMENT

A. University and BSP entered into a Multi Media Rights Agreement ("Original Agreement") on July 1, 2004.

B. University and BSP amended the Original Agreement by a first amendment on May 22, 2006 ("Amendment") to extend the term of the Original Agreement and provide funding for a new scoreboard at Bulldog Stadium.

C. BSP and University have agreed to amend and restate the Original Agreement as amended by the First Amendment in their entirety in order to set forth new terms and conditions relating to the rights and obligations of both BSP and University in connection with the "Multi-Media Rights", as hereinafter defined, relating to the University's intercollegiate athletic programs.

D. BSP and University intend that this Agreement shall represent and contain the terms and conditions governing the Multi-Media Rights of the University's intercollegiate athletic programs and, when executed by both BSP and University, will replace in its entirety the

1

Original Agreement and the First Amendment beginning with the 2008 Athletic Year on July 1, 2008.

E. University and BSP acknowledge and agree that the increase in the Guaranteed Rights Fee under this Agreement, the increase in the Revenue Share Hurdle Amounts under this Agreement and the extension of the term of the Original Agreement under this Agreement were all negotiated and bargained for in good faith between University and BSP with the University receiving adequate consideration in agreeing to an increase in the Revenue Share Hurdle Amounts by virtue of an increase in the Guaranteed Rights Fee and with BSP receiving adequate consideration in agreeing to an increase in the Guaranteed Rights Fee by virtue of an extension of the term of the Original Agreement and an increase in the Revenue Share Hurdle Amounts.

F. For purposes of this Agreement, the Term "Multi-Media Rights" shall mean the exclusive sales and marketing rights, as hereinafter set forth, with exceptions as set forth within, to inventory, including, but not limited to, print, media, advertising, sponsorships, existing or new signage not already contracted to other parties, and other promotional and sponsorship rights for football, men's and women's basketball games and other intercollegiate sports; existing or new temporary or permanent and promotional rights for home basketball games and all games played at neutral venues where University is designated as the home team; temporary and permanent signage and promotional rights for all University home football games (and all games played at neutral venues where University is designated as the home team); radio play-by-play broadcast rights and coaches' shows and selected television broadcast rights for football and men's and

2

women's basketball; official athletic website sponsorship; and any other sponsor-related or promotional rights to University's athletic programs that may be subsequently agreed to between the Parties.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein and the foregoing Background, which is an integral part of this Agreement and therefore incorporated herein for all purposes, University and BSP (individually the "Party" and jointly the "Parties") agree as follows:

3

## AGREEMENT

**1.1  Term of Agreement.**  This Agreement is effective on July 1, 2008 ("Effective Date") notwithstanding the fact that it has been signed on a date after the Effective Date by both Parties and shall continue until June 30, 2019 ("Term") unless otherwise terminated as provided herein.  Each contract year of the Agreement shall commence on July 1 and end on June 30 and such period shall sometimes hereafter be referred to as "Athletic Year."  The Parties' rights and obligations under this Agreement begin on the Effective Date.  No later than July 1, 2017, University shall meet with BSP to discuss an extension of this Agreement beyond the Term and if no agreement is reached by the Parties by October 1, 2018 on the terms and conditions of an extension to this Agreement, BSP shall have a first right of refusal to obtain the Multi-Media Rights from University on the same terms and conditions that University is willing to accept from a bona fide third party offeror ("Third Party Offer").  BSP shall have thirty (30) days to agree to meet the terms and conditions of the Third Party Offer and retain the Multi-Media Rights.  If BSP does not agree to the terms of the Third Party Offer or if BSP does not notify University within such thirty (30) day period as to whether BSP does or does not wish to accept the terms of the Third Party Offer, then University may proceed and enter into an agreement based solely upon the Third Party Offer.  Prior to October 1, 2018, University will not solicit from or discuss with any third party the granting of the Multi-Media Rights.

**1.2  Mutual Cooperation.**  Throughout the Term of the Agreement, it is the Parties' intention to cooperate to maximize the opportunities that will foster interest in the University's athletic programs and growth in both the amounts and the potential sources of revenue under this Agreement.  To that end, the Parties, including University's Director of Athletics (and/or his

4

designee) will meet, as they mutually agree is necessary, to discuss the rights and inventory licensed to BSP and any unexpected problems arising therefrom to arrive at mutually satisfactory solutions. The General Manager of BSP will be encouraged to attend regularly scheduled University Athletic Department Senior Staff meetings and will meet each month with University's Director of Athletics or his designee at times mutually agreeable to the Parties. In addition, University will use reasonable efforts to clearly and concisely define for University's staff the specific roles and responsibilities which BSP will undertake with University's Athletic Department, including, but not limited to, any agreements BSP enters into with University's coaches which BSP and University mutually determine will help maximize revenue generating opportunities. BSP will keep University informed on a regular basis and/or upon request by University of its sponsorship and marketing plans as well as its current activities.

    **1.3**    **Additional Multi-Media Rights.** Although this Agreement includes specific rights granted to BSP, it is agreed that from time to time opportunities for additional Multi-Media Rights may arise or be created that might not have been contemplated or specifically mentioned in this Agreement, including, but not limited to, BSP finding additional ways to leverage the existing inventory ("Additional Rights"). If the nature of the Additional Rights requires the addition of a significant item of inventory that did not already exist in an athletic venue in any format and it materially alters the athletic venue within which such item of inventory is to be used ("Material Alterations"), then BSP will notify University of such new inventory item in order to obtain University's approval of such new inventory item, which approval will not be unreasonably withheld. Except for Additional Rights which require

5

Material Alterations, for which University's approval is required, BSP may initiate all Additional Rights upon notification to University of the nature of the Additional Rights.

1.4 **The Association/Save Mart Center.** University has an agreement with the California State University, Fresno Association, Inc. ("Association") that provides University opportunities to market certain promotional, advertising, signage, sponsorship, telecasting, broadcasting, and/or other media rights on/at/relative to the California State University Fresno campus (including all athletic venues associated therewith) (collectively "University Campus"), subject in all respects to existing exclusive sponsorship agreements, covering the Save Mart Center, and in some cases, the entire University campus, which sponsorship agreements are between the Association and various sponsors ("Association Exclusive Sponsorship Agreements"), (copies of which have been or will be provided to BSP and are specifically identified on Schedule 1.4 which is attached to this Agreement). In this regard, the Parties to this Agreement acknowledge that such Association Exclusive Sponsorship Agreements provide those sponsors with exclusive promotional, advertising, signage, sponsorship, telecasting, broadcasting and other media rights relative to the Save Mart Center and in some cases, the entire University campus. As a result, notwithstanding anything else contained in this Agreement, the parties hereto agree that: (i) the terms and conditions of this Agreement shall be subject in all respects to said Association Exclusive Sponsorship Agreements and the aforementioned agreement between University and the Association, (ii) BSP shall not negotiate, sell and/or market any rights or benefits which would constitute a violation of the Association Exclusive Sponsorship Agreements, and (iii) any use, sale, or representation of the inventory or other rights granted to BSP under the terms of the Agreement, by the Association or any other parties, shall be subject

6

to the approval of the Parties.  Except for the existing Association Exclusive Sponsorship Agreements listed on Schedule 1.4, University will not sign any other agreement with the Association which would grant any third party, other than BSP, any sponsorship rights whether exclusive or non-exclusive for athletic events in the Save Mart Center and if the Association grants University any additional sponsorship rights in the Save Mart Center, University shall assign all such rights to BSP.

**2.1  Grant of Exclusive Radio Broadcast Rights**.  University grants to BSP, subject to any restrictions and modifications set forth by this Agreement, the exclusive rights to make live radio (including satellite radio and any other terrestrial methods) broadcasts of all pre-season, regular-season (conference and non-conference) and post-season football games; all exhibition, regular-season (conference and non-conference) and post-season games for men's basketball; and all regular-season (conference and non-conference) and post-season games for baseball.  All of such broadcast rights shall be exclusive to BSP and shall also include any game or games selected for broadcasting by any local, regional or national radio network, subject, however to any contracts, commitments or any rules governing University as a result of its affiliation with the Western Athletic Conference (or any other conference to which University may belong in the future) or the National Collegiate Athletic Association ("NCAA") that were in existence on the Effective Date and which could limit such exclusivity. University represents and BSP acknowledges that University has provided to BSP, prior to execution of this Agreement, copies of all such contracts, rules and regulations.  Throughout the Term, University will continue to provide BSP all merchandising elements that are necessary for BSP to clear the radio broadcasts including tickets and hospitality at the same historical levels that were provided to BSP under the

7

Original Agreement. University acknowledges that broadcast rights to post-season conference and national tournaments are important to BSP's revenue, and if such rights are not available to BSP, then University shall negotiate in good faith with BSP for a fair and equitable reduction in BSP's Guaranteed Rights Fee during the time the rights are unavailable. Rights to these specified games are exclusive of all other individual and independent networks except those officially designated as origination stations or networks by radio stations considered by University as part of the radio following the opposing team involved in the game being broadcast. BSP shall use its best efforts to provide the widest exposure in the most professional manner relative to all broadcasts. Notwithstanding the exclusive rights granted to BSP under this Section 2.1, and subject to University's approval, University student stations may broadcast games, but only on a radio station which will not carry any commercial underwriting or commercial sponsorship or advertising of any kind for such game.

BSP acknowledges University's existing agreement with radio station KFIG that grants KFIG the exclusive right to broadcast University women's basketball games, women's volleyball games, softball games and two weekly talk shows (the "KFIG Agreement") The KFIG Agreement will expire at the end of the 2009 – 2010 Athletic Year (June 30, 2010). Accordingly, until the expiration of the KFIG Agreement, the broadcast rights to the events described above under the KFIG Agreement ("Other Athletic Events") are not part of the broadcast rights granted by University to Learfield under this Agreement; provided, however; upon the expiration of the KFIG Agreement, BSP shall use its best efforts, but shall not be required, to clear the Other Athletic Events on another station with a similar signal strength to KFIG ("Additional Clearance"). If BSP decides to obtain the Additional Clearance, University

8

will be responsible for all of the costs associated therewith, including rights fees, travel expenses and merchandising elements. Prior to BSP executing an agreement with a radio station for the Additional Clearance, BSP shall provide University with the terms of such an agreement for University's approval, which approval will not be unreasonably withheld. University further agrees that it will not sign any amendment or extension to the KFIG Agreement without BSP's prior written consent.

2.2   **On-Air Talent**. BSP will employ, at its own expense, any and all personnel BSP deems necessary to conduct broadcasts covered by the Agreement. Final selection of all on-air talent for all games, including, but not limited to pre-game, post-game, coaches' shows and other events to be broadcast must have the approval of University which approval will not be unreasonably withheld.

BSP will be responsible for the broadcasting crew's hotel, per diem, and commercial airline or vehicular travel expenses. If requested by BSP, University will make best efforts to supply up to four seats for the radio crew on any team charter for football, men's basketball or baseball.

2.3   **Programming**. At the sole cost and expense of BSP, BSP shall produce, originate, broadcast and distribute the following programming with state-of-the-art equipment and quality:

A.   Football, Men's Basketball Games. BSP will provide live broadcasts of each (i) regular-season (conference and non-conference), conference championship and bowl games for University varsity football, which may include the spring football game; (ii) each regular-season (conference and non-conference) and post-season men's basketball game; and (iii) shall use reasonable efforts to broadcast each men's basketball exhibition game.

9

Each broadcast shall include pre-game and post-game shows with live or taped, as available, coaches' interviews, in addition to comprehensive description of game action. BSP shall pay for all costs associated with the production of the Network.

B.    Baseball Games.  BSP shall produce and clear locally selected regular-season and post-season baseball games.  The exact number of games will be mutually agreed to by BSP and University.  Each broadcast of baseball games, will include, at a minimum, a fifteen (15) minute pre-game show and a fifteen (15) minute post-game which shall include either live or taped coaches' interviews, in addition to comprehensive description of game action.  BSP shall pay for all costs associated with the production of the Network.

D.    Coaches' Radio Shows and Daily Shows.  BSP shall use best efforts to produce, sell and commercially distribute a weekly coaches' radio show for football and men's basketball and make all shows available to BSP's flagship station on the Bulldog Sports Network ("Network") subject to technical constraints.  BSP will attempt to produce and clear approximately thirty (30) football and men's basketball weekly coaches' shows each year that will be sixty (60) minutes in length.  The exact number of shows will be consistent with the number produced and cleared in the past under the Original Agreement. Irrespective of whether or not BSP broadcasts a coach's weekly show in any of the above sports, BSP shall retain the exclusive broadcasting rights to all such coaches' shows throughout the Term of the Agreement.  University will make available and provide the services of the head coaches of each such coaches' show and BSP will pay the compensation of each coach for such shows. Further, BSP is hereby granted the exclusive rights, at its option, to produce coaches' radio shows for other sports.  University shall

10

require coaches to be in attendance at each show agreed to under such contracts, provided the time commitments undertaken by each such coach is consistent with the coach's primary coaching responsibilities. The coaches' shows may be broadcast with the coach participating by telephone in certain limited pre-arranged instances, or, through an assistant coach under certain limited circumstances. However, University shall make best efforts to provide such head coaches shows live. In this regard, it is agreed that a period of time which is sufficient for the production of a sixty (60) minute weekly radio show will not unduly interfere with a coach's primary responsibility to University. BSP may sell a specific placement of any or all of the coaches' shows at a location to be determined by BSP, such as a local restaurant or other campus or off-campus location and University will make the coach available at such location.

BSP shall also use best efforts to produce, sell and commercially distribute a daily (Monday through Friday) radio show of an approximate length of 2 minutes to 3 minutes featuring University coaches and athletic department officials.

**2.4  Athletic Internet Site and Internet Video Streaming and e-Commerce.**  While University will control and produce its official athletic website, University hereby grants to BSP the exclusive rights to all revenue generating opportunities, which now exist on the University's Official Athletics Website ("OAS") (www.gobulldogs.com) including, but not limited to e-commerce, e-mail blasts, all rights to sell sponsorships in the form of company logos and messages on University's OAS, direct internet access to other websites as well as all other sponsorship opportunities which now or in the future may exist on the OAS, including, but not limited to, audio and video streaming, premium content and other revenue opportunities

11

connected with the OAS. All resulting net revenue derived by BSP shall be added into the calculation of Adjusted Gross Revenue ("AGR"). AGR is defined as Collected Gross Revenue (defined as total revenue, billed and collected, less agency commissions and third-party rights fees such as NCAA or NIT related sponsorship fees) as well as all other direct out-of-pocket promotional costs such as tickets and client fulfillment expenses and production costs. University shall retain all revenues from merchandise sales, on-line auctions, ticket sales, and donations and fundraising events derived through the OAS. University grants BSP the right to negotiate on University's behalf any extension, modification, amendment or new agreement with CBS Sports in connection with the OAS.

**2.5    Satellite Radio Rights and Additional Broadcast Rights.** University hereby licenses the exclusive satellite radio rights to BSP. BSP shall be entitled to all rights fees relative thereto. Notwithstanding anything contained in Section 2.1 through 2.5 to the contrary, it is agreed that from time to time forms or methods of additional distribution rights may arise or be created that might not have been contemplated or specifically mentioned in this Agreement, and these rights shall be subsequently included in the exclusive rights granted to BSP, and the net revenue from such rights shall be added to the AGR.

**2.6    Coaches' Television Shows.** BSP shall have the exclusive right, but no obligation, to broadcast and sell sponsorships in a weekly coaches' television show. Compensation of coaches, if any, will be paid by BSP. University will extend its best efforts to get coaches to appear in coaches shows at no charge to BSP. Compensation for show hosts, production and distribution for all shows will be paid by BSP. BSP may sell a specific placement of the show at a location to be determined by BSP, such as a local restaurant, subject to the reasonable consent

12

of University and the respective coaches. University shall require coaches to be in attendance at each show agreed to under such contracts, provided the time commitments undertaken by each such coach is consistent with the coach's primary coaching responsibilities. In this regard, it is agreed that a period of time which is sufficient for the production of a thirty-minute weekly coaches' television show will not unduly interfere with a coach's primary responsibilities to University. Coaches will be encouraged but shall not be required to attend coaches' shows in person if the show is broadcast from outside the Fresno, California area.    All resulting net revenue derived by BSP shall be added into the calculation of AGR.

   **2.7   Other Television Opportunities.** BSP shall have the exclusive rights to broadcast television play-by-play programming at its expense which is not otherwise prohibited by the WAC or the NCAA ("Other Television Opportunities"). Such Other Television Opportunities include, but are not limited to, live and/or delayed broadcasting of football games, men's basketball games, women's basketball games, baseball games, softball games, football bowl preview shows live from the bowl site, a video season ticket podcast, football replay shows, a video magazine show, pre-game programming, starting line-ups and keys to the game, half-time coverage including a scoreboard show, a feature on a University player or coach, interviews with the University coaches as well as the opposing team's coach. University will publicize the Other Television Opportunities by including programming information, affiliates list and other pertinent information on its regular schedule of press releases and Athletics publications. BSP shall hire the broadcast crew subject to University's approval, which approval will not be unreasonably withheld. BSP will pay travel cost for all televised road games for on-air talent. BSP will retain all revenue generated from the Other Television Opportunities and such revenue

University will encourage its coaches to cooperate with BSP to accommodate reasonable requests of BSP for its sponsors (such as special appearances, autographs, and letter-writing). University will also encourage its coaches to endorse only those sponsors that are not in competition with the sponsors secured or being pursued by BSP. Coaches will be compensated by BSP for endorsements made by the coaches at BSP's request. Any such endorsements and monies paid to coaches by BSP must conform to University, Western Athletic Conference, and NCAA rules and guidelines.

**2.9   Video/DVD Rights.** If BSP and University mutually agree that a season ending highlight video or DVD is warranted for a particular team, BSP shall, at its expense, produce or cause to be produced and sell or cause to be sold, such video or DVD. If BSP elects not to produce a highlight video or DVD, University will have the right to contact other third parties to produce and sell the highlight video or DVD. BSP shall retain the right to sell all sponsorships, including a title and/or presenting sponsorships, and retail partnerships for the highlight video or DVD. Any net revenue (in excess of the cost of producing and selling the video or DVD) shall be considered part of the AGR.

**2.10  Game Program Production and Sponsorship Rights.**

2.10.1 <u>Matters Relating to Programs</u>. All costs of printing and distributing football, men's basketball, women's basketball, baseball, volleyball and softball game programs will be the responsibility of BSP. The cost of printing and distributing the volleyball program will be deducted from the Marketing Subsidy set forth in Paragraph 5.2 of this Agreement. The quality and quantity of the game programs will be not less than what has historically been produced on a per-game basis for University based on sales demand. University shall be

15

will be part of AGR as hereafter defined.  Notwithstanding anything contained in this Section 2.7 to the contrary, University guarantees that BSP shall have the exclusive right to clear for live television broadcasting not less than two (2) football games each Athletic Year which shall include the pre-game, play-by-play of the game and post-game ("Minimum Televised Games"). If in any Athletic Year BSP cannot clear the Minimum Televised Games, University agrees to negotiate in good faith with BSP a reduction in the Guaranteed Rights Fee which takes into account the revenue that BSP loses as a result of it and not being able to clear the Minimum Televised Games.

BSP agrees to pay $1,000 per game to University if BSP utilizes an existing member of the University staff for video coordinator services.  Any such payments will be allocated as directed in writing by the Director of Athletics.

In exchange for advertising the Bulldog Shop in all football and basketball television broadcasts, as well as video board advertising and signage at athletic venues, BSP will receive a $5,000 retail merchandise credit each Athletic Year from either the Bulldog Shop and/or the University.

**2.8 Miscellaneous Terms Applicable to Coaches.**   Subject to the coaches' sponsorship rights, University will encourage its coaches to cooperate with BSP should BSP need to obtain an endorsement that is beneficial in maximizing the income from the rights granted under this Agreement; nevertheless, BSP acknowledges that coaches shall not be required to endorse a particular product. University will use its best efforts to prevent its coaches from participating, directly or indirectly, in the endorsement of any product or service that competes with the products or services offered by BSP's sponsors.  Except as set forth herein,

14

responsible for providing all written content and editing thereof that is required for each program and will work with BSP to determine the design of programs and in some instances will be responsible for design elements of the programs. University retains final control of all content, but not sponsorships, of its game day publications. To that end, University shall be responsible for supplying BSP or its printer with game program content within a reasonable amount of days prior to a program's publication. BSP will provide University with a mutually agreeable reasonable number of complimentary programs for football, men's and women's basketball, baseball and softball. In addition to the sponsorship revenue from game day programs, BSP will retain all game day vending revenue from program sales which shall be added to the AGR.

2.10.2 <u>Football, Men's and Women's Basketball, Baseball, Volleyball and Softball</u>. BSP shall have the exclusive right to print, publish, distribute and sell sponsorship space in football, men's basketball, women's basketball, baseball, volleyball and softball game programs (or similar game day publications) for all home games played by University and those designated as home games although played on a neutral site, during its regular seasons.

2.10.3 <u>Olympic Sports</u>. BSP shall have the exclusive right to sell sponsorship space in other Olympic sports where game programs are produced (or similar game day publications) for all home games played by University and those designated as home games although played on a neutral site during its regular season.

**2.11 Sponsorship Signage.** University grants BSP the exclusive rights to sell sponsorships on all the existing as well as all the future permanent signage (electronic or otherwise) and temporary signage in all University athletic venues, including, but not limited to, Bulldog Stadium, Save Mart Center, Beiden Field and Bulldog Diamond and further grants to

16

BSP the exclusive rights to sell sponsorships on all permanent and temporary signage, in all other University athletic venues. In the event University wishes to install new signage in Bulldog Stadium, Save Mart Center, Beiden Field or Bulldog Diamond including but not limited to LED, or DLP signage or a new jumbotron (collectively the "New Signage"), BSP will have input into the New Signage in order that BSP can manage the sponsorships which will result from the New Signage.  The foregoing notwithstanding, University reserves the rights to utilize signage (electronic or otherwise) for such reasonable amounts of time as agreed upon by BSP for pre-game, half-time, quarter breaks, game time-outs or post-game for University's need to promote University sports, University or University events or accomplishments, or athletically-related activities as deemed reasonably necessary by University but in no event for any commercial underwriting or commercial sponsorship or advertising of any kind.  If the University adds New Signage, the University will be responsible for the costs of the New Signage, including installation, but BSP will increase the Guaranteed Rights Fee to be paid to the University, · beginning with the first full year that the New Signage is operational, by fifty percent (50%) of the incremental rate card value of the sponsorships available and actually sold by BSP on the New Signage; provided, however, if a sponsorship is sold by BSP on the New Signage but the New Signage is not operational for the entire length of the sponsorship, the increase in the Guaranteed Rights Fee shall only apply to the amount of revenue actually received by BSP from the sponsor, it being agreed and understood by the University that one or more sponsors may elect to cancel part or all of their sponsorships if the New Signage is not operational for the length of the sponsorship agreement.  Notwithstanding anything contained in this Section 2.11 or elsewhere in this Agreement to the contrary, BSP shall not be required to increase the

17

Guaranteed Rights Fee for the New Signage if the New Signage is either (i) for the enjoyment of the University's fans or for the enhancement of the game experience; or (ii) the New Signage is located in an athletic venue where BSP does not then have all of its available inventory sold.

2.11.1 Athletic Venue Sponsorship Rights. University hereby grants BSP the following exclusive specific athletic venue sponsorship rights which include, but are not limited to, the following:

**Bulldog Stadium:**

➢ University's fixed scoreboard signage

➢ Tri-Vision panels

➢ Any sideline and end-line advertising panels

➢ Façade, tunnel and concourse signage

➢ Tunnel signage

➢ Electronic ribbon-board fascia displays

➢ Video displays

➢ Temporary signage for events as approved by University which approval will not be unreasonably withheld

➢ Message Center displays

➢ Video board advertising displays and promotions at all events

➢ Public Address announcements at University events

➢ Concourse displays

➢ Press conference backdrops

➢ Coaches' headsets

18

- Cedar/Barstow Marquee

- Temporary logo rights on the field if they are approved by the WAC and University. BSP shall be responsible for all expenses relative to said logo rights on the field.

- Plastic souvenir cups and concession (food) containers

- Field Goal Net signage

- Football Goal Post pad signage

- Sideline employees (e.g. chain crew, managers, etc.) clothing and equipment

- Cup Holders

- Other opportunities as reasonably approved by University

**Save Mart Center Elements:**

- Any scorer's table, press row or baseline table advertising panels (rotational or static)

- Message center displays

- Video advertising displays

- Public address announcements

- Basketball goal post padding subject to NCAA rules

- Basketball backboard supports subject to NCAA rules

- Temporary or permanent playing surface logo opportunities, as approved by University

- Shot clock advertising panels subject to NCAA rules

- Concourse and lobby displays

19

➤ Static signage (existing or planned) in and around concession areas, facility entries/exits, restrooms, concourses, portal entries/exits into seating areas

➤ Temporary signage and displays for special events

➤ Plastic souvenir cups and concession (food) containers

➤ Field employees clothing and equipment for ball boys, managers, etc. but not umpires

➤ Other opportunities reasonably approved by University

2.11.2 Existing Message Board, Videoboard Rights, and Public Address Announcements. University grants BSP the exclusive rights to secure sponsors for announcements, messages and videoboard displays on existing public address, electronic ribbon boards, scoreboards or videoboards including, but not limited to, out of town scores, trivia, statistics, features, segments, replays, commercial logo branded messages and contests. University will provide BSP and its sponsors the necessary production and execution support needed for such announcements and messages at no cost to BSP. The amount of necessary production and execution support provided will be reasonable and commensurate to that amount provided by University for sponsors in the past. University shall approve all video board content which approval will not be unreasonably withheld.

2.11.3 Maintenance of Sponsorship Signs, Message Boards and Videoboards. BSP shall be responsible for all costs and expenses relative to any copy or art changes or replacement of existing signs, including, but not limited to, the identification of new sponsors or the repair or upgrade of existing sponsor signs. University will be responsible for the maintenance of both the existing and any new permanent signage and equipment, including the

21

- ➢ Temporary or permanent and displays for special events
- ➢ Plastic souvenir cups and concession (food) containers (in accordance with the existing concessions contract)
- ➢ LED and DLP displays
- ➢ University, opposing team and scorer's table Chairback advertising
- ➢ University, opposing team bench kick plates
- ➢ Press Backdrop
- ➢ Team entry cover signage, provided that no permanent advertising signage is covered or blocked
- ➢ Blimp signage
- ➢ Courtside employees, not to include scorer's table personnel (e.g., ballboys, managers, etc.) clothing and equipment
- ➢ Other opportunities as reasonably approved by University

**Bieden Field  and Bulldog Diamond Elements:**

- ➢ University's fixed scoreboard signage
- ➢ Main scoreboard video displays
- ➢ Outfield wall signage
- ➢ Message Center displays
- ➢ Video advertising displays
- ➢ Public address announcements
- ➢ University and opposing dugout signage
- ➢ Playing surface logo opportunities as reasonably approved by University

20

videoboards, rotating signage and static signage. University will be responsible for payment of the game day video board production. University will guarantee that all such signage will be fully functional and operational, and will promptly make any necessary repairs. If signage at a game or event is not fully functional or operational, irrespective of the reason, BSP will use its best efforts to make good any signage not available to a sponsor with other inventory. If, despite BSP's best efforts to make good any signage which was not available to a sponsor with other inventory, the sponsor will either not accept the make good inventory in complete satisfaction of the lost signage, or if the sponsor accepts less than all of the make good inventory resulting in a dollar amount still owed to the sponsor by BSP (collectively the "Make Good Dollar Amount"), then the Guaranteed Rights Fee shall be reduced by the Make Good Dollar Amount; provided, however, if BSP's insurance company pays a claim for the Make Good Dollar Amount, then no reduction in the Guaranteed Rights Fee will occur.

   2.11.4 <u>New Inventory Items</u>. It is understood and acknowledged that from time to time University may wish to install new items including signage or upgrade existing items which are capable of adding to the inventory available under this Agreement or enhancing the existing inventory ("New Inventory Items"). The New Inventory Items shall belong exclusively to BSP and the net revenue received by BSP from any New Inventory Items and the New Signage shall be added to the AGR each year.

   2.11.5 <u>Temporary Signage</u>. University, at no additional cost or expense, agrees to help facilitate BSP obtaining the exclusive rights to sell or create temporary signage opportunities at University games or events which occur at a neutral venue. Any such temporary signage shall be paid for, erected, maintained and operated at the sole cost and expense of BSP.

22

**2.12 Naming Rights.**   University may internally pursue, at its discretion, naming opportunities without payment of a commission to "Contractor," as hereafter defined, if such naming opportunities are from a non-commercial source (for example, a facility named after a donor).   However, if the University pursues a corporate naming rights agreement for any of its athletic venues, University hereby grants Learfield the first opportunity through its wholly owned subsidiary company, Team Services, LLC, ("Contractor") to negotiate in good faith with University for a reasonable length of time, with specific and mutually agreed conditions and terms set at the onset of the contract, an exclusive agreement for Contractor to represent University in solicitation of corporate sponsors for such naming rights.   In the event Learfield or Contractor is unable to secure an agreement with a corporate sponsor for naming rights under this first right of refusal, University may then negotiate with corporate sponsors.   However, to protect BSP's financial relationship with sponsors, if a Naming Rights Agreement is secured from an existing sponsor (regardless of whether BSP, Learfield, Contractor, the University, or some other entity secures the existing sponsor) and such existing sponsor elects to reduce or eliminate the dollar amount of its sponsorship with BSP or the inventory that BSP had available in the renamed facility is diminished, altered or eliminated, or if a Naming Rights Agreement is secured from a sponsor who is not then a BSP sponsor but whose products and/or services are competitive with those of an existing BSP sponsor and as a result, BSP's existing sponsor elects to reduce or eliminate the dollar amount of its sponsorship with BSP or the inventory that BSP had available for the existing sponsor in the renamed facility is diminished, altered or eliminated, then the University will either replace inventory to BSP's reasonable satisfaction, or reduce the Guaranteed Rights Fee by a reasonable amount to be agreed upon by the Parties which takes into

account BSP's lost revenue; provided, however, any reduction in the Guaranteed Rights Fee shall apply only to commercial sponsors and does not apply to naming rights the University may grant to its private donors unless any inventory in the athletic facility which was previously available for BSP's sponsors is reduced or eliminated as a result of the private donor's name being placed thereon or therein.

**2.13 Promotional Items and Events.** University grants BSP the exclusive rights to the following promotional items and events:

2.13.1 Printed Promotional Item Rights. BSP will have the exclusive right to sell sponsorships on all University printed promotional items including, but not limited to, team rosters, ticket backs, parking passes, roster cards, media guides, ticket applications and mailer inserts, ticket envelopes, posters, magnets, sports calendars, fan guides, trading cards and schedule cards ("Printed Materials"), but does not include Save mart Center ticket backs, parking passes, and ticket envelopes. University and BSP will mutually agree on an annual basis upon the sponsors, content and amounts of Printed Materials. However, the quantity (numbers produced) and quality will be no less than was being produced by or for University historically. University will be responsible for the design of Printed Materials. All expenses and costs Printed Materials will be the responsibility of University.

2.13.2 Game Sponsorship and Promotional Sponsorship Rights. BSP will have, at a minimum, the right to secure sponsors for pre-game, game "time-outs", half-time, and quarter breaks sponsored promotional activities and special game day on-field and on-court promotions or contests as well as official game sponsorships. University reserves the right to use, at no cost and expense to BSP, a reasonable amount of time to be agreed upon by BSP, for

24

any pre any pre-game, game "time-outs", half-time, and quarter breaks for University's need to promote University fundraising efforts, development projects, University sports, upcoming University events or University accomplishments, or University athletically related activities. However, the Parties shall negotiate in good faith regarding the impact from any such activities (such as corporate recognition for a fundraising event) on BSP's ability to sell, and a corresponding make-good of lost rights or inventory will be provided to BSP if BSP's sponsorship opportunities are diminished or eliminated. Promotional activities may include, but are not limited to, premium item giveaways, fan contests on the field, floor, or in the stands, sponsored entertainment acts, product samplings, inflatables, games, temporary signage, couponing and free product distribution and product displays. By the 15th day of February each year, BSP will coordinate and discuss with University an annual game/event promotions sales plan. University will provide BSP with assistance in the sponsorship, promotions and implementation/facilitation as needed during these game-related activities.

   2.13.3 <u>Game Day Hospitality</u>. University shall retain the rights to hospitality tents and related group ticket sales ("Hospitality Rights"). Except for the Hospitality Rights, BSP will have the right to sell corporate hospitality events for football and men's basketball at Historical Levels. Hospitality event space at Historical Levels will be provided at no additional cost to BSP. Subject to availability, University shall provide to BSP, at no cost to BSP, space for hospitality for its clients at all University home football and men's and women's basketball games as well as all football games played at a neutral site if University is designated as the home team.

   2.13.4 <u>Fan Festival Rights</u>.   BSP shall have the exclusive right to sell

sponsorships, sponsorship packages (including tickets, meal and beverage vouchers and corporate involvement) for any interactive fan festival or related activities as well as those that BSP creates in the future for other events such as men's and women's basketball.   The University agrees to provide a mutually agreeable location to conduct a fan festival for each sport at no cost to BSP.   The net sponsorship revenue from such events shall be added to the AGR.   The following are examples of at-event impact sponsorship inventory which will be available throughout the Term exclusively to BSP but such examples are not intended to be the only available inventory:

> Product displays

> Sampling, couponing and free product distribution to fans attending University events

> Title and/or rivalry sponsorships of University athletics events held in Fresno, California

> Presenting sponsorships of University athletics events

> Pre-game post-game, half-time and timeout in-arena/stadium, on-court/field promotions, contests, mascot appearances, corporate recognition/presentations, and/or giveaways

> Plastic souvenir cups and concession (food) containers (subject to existing University agreements)

> Inflatables/games

> Kid's Club sponsorships

> Varsity team tournaments and special events

> Ancillary entertainment opportunities such as half-time shows, etc.

26

➢ Midnight Madness-type events

2.13.5 <u>Bulldog Foundation Event Sponsorships</u>.  BSP shall have the right to sell certain Bulldog Foundation event sponsorships as mutually determined by BSP and University. All net revenue from such events shall be added to the AGR.

2.13.6 <u>Licensing Opportunities & Retail Promotions</u>.  Commensurate with historical broadcast and sponsorship agreements, and subject to existing licensing agreements, University grants BSP the right to use University Athletic Department's name, trademarks, service marks, logos or symbols at no cost to BSP and its sponsors with regard to any promotions, sponsorships, commercial endorsements, or any other marketing activities covered in this Agreement; provided, however, BSP agrees that the sale of University logo bearing merchandise by BSP is prohibited unless such sales occur through a licensed University provider.  The Guaranteed Rights Fee is based in part upon BSP's ability to continue to sell specific sponsorships in public places which makes use of a University athletic logo ("Sponsorships Including Logo" or "S.I.L.").  BSP shall have the right to sell S.I.L. throughout the Term of this Agreement subject only to University's approval of the artwork used in S.I.L. Such approval will not be unreasonably withheld. To the extent University has in existence any collegiate licensing agreement ("Licensing Agreement"), University shall provide BSP with a copy of the Licensing Agreement and BSP shall not exercise any rights under this Agreement which, if exercised, would violate the terms and conditions of the Licensing Agreement. University agrees not to execute any additional licensing agreement or amend or modify any existing Licensing Agreement if as a result thereof, BSP's rights under this Agreement are diminished in any manner.  If for whatever reason, BSP is prevented from selling S.I.L. at the

27

same or higher historical levels, the Parties will agree upon an appropriate offset against the Guaranteed Rights Fee.

BSP and its clients/sponsors will have the right to use tickets in their retail promotions and all their projects which are related to BSP's rights under this Agreement. University and BSP will prohibit the use of athletic event tickets for promotional purposes that specifically compete with BSP's sponsorship sales efforts ("Restriction") by all other parties without the approval of University and BSP. University agrees to place an appropriate notice on all athletic event tickets in order to give effect to the Restriction.

**2.14   Rivalry Series.**   The Parties will cooperate in the development of additional promotional marketing opportunities, including, but not limited to, the right to market and/or create one or more corporate-sponsored rivalry series for all athletic events. Specific details of any new rivalry series events will require the approval of the University which approval will not be unreasonably withheld. Any rivalry series which is created by BSP as well as all neutral site games whose rights belong to University and not the other team shall be BSP's rights on an exclusive basis, including sponsorships, game sponsorships, print rights and all other promotional items. As part of any future agreement for a neutral site game whose rights belong to the University, University will prohibit the solicitation of any University/BSP client in a major sponsorship category (including, but not necessarily limited to, telephone, insurance, banking, and automobile), and will prohibit the solicitation of any competitor of BSP client in a major sponsorship category, for a title sponsorship and secondary or "presenting" sponsorship.

**2.15   Suite Sales.**   University retains the right to all sales and related revenues relative to premium seats and suites in its athletic venues, except those otherwise provided for in this

likewise increase.  Accordingly, BSP and University agree to meet at the end of each Athletic Year to determine the ticket allotment for the following sports season and University agrees that the growth rate of ticket allocations shall be commensurate with the rate of revenue growth.

BSP shall receive the use of two (2) suites at Bulldog Stadium for each football game and two (2) suites at the Save Mart Center for each men's and women's basketball game at no cost to BSP.  If a suite is not used by BSP, BSP will notify the University as soon as possible and will release such suite to University for its use.

During each year of the Term, University will provide BSP the right to purchase 60 tickets to University post-season football special events (i.e., Western Athletic Conference Championship Game, if played in the future), 60 bowl game tickets, 48 men's and women's Western Athletic Conference all session basketball Championship tickets, 20 men's and women's basketball special events tickets, 20 men's and women's basketball NCAA first- and second-round tickets and 32 NCAA men's and women's regional tickets and 50 Men's and Women's Final Four tickets (with a minimum of 12 Final Four tickets in the lower arena), and 20 Western Athletic Conference baseball tournament tickets, and NCAA baseball world series tickets contingent upon University teams advancing to the respective post-season game or level. The quality of the tickets allocated to BSP will be proportional to the quality of the total tickets made available to University.  If, for example, one-third of University's tickets are in the lower level of the Western Athletic Conference Tournament, one-third of BSP's allocation of tickets will be in the lower level, as well.  At BSP's option, it may purchase from University an additional 100 tickets to each of the foregoing named events, based on the availability and the importance of other demands for said tickets as determined by the Athletic Director.    In

30

Agreement.  However, it is understood that should University decide to outsource premium seats or suite sales to a third party, BSP shall have the first right of refusal for such a service.

    **3.1  Tickets, Parking and Other Merchandising/Hospitality.** University shall provide BSP, at no cost to BSP, not less than the same historical number of tickets in the same or better historical locations to football, men's and women's basketball, softball, baseball and women's lacrosse games which were provided or allocated sponsors and advertisers for the 2008 – 2009 Athletic Year ("Base Ticket Amount"). The Base Ticket Amount will be mutually determined by July 17, 2009.

    In addition to the Base Ticket Amount, BSP shall have the right to purchase additional tickets from University, the quality of which will be based upon availability and the tickets afforded the highest level of donor status by University ("Additional Tickets"). The price for the Additional Tickets shall be at a 50% discount for individual game tickets and 30% discount for season tickets.  It is understood that BSP cannot create season ticket packages through the purchase of individual game tickets.  It is understood by the Parties that additional seats in the "red" seating area in Bulldog Stadium or the Save Mart Center, may be subject to additional fees . or contributions.  University shall also provide BSP, at no cost to BSP and if available, the same number of parking passes, as mutually determined by July 17, 2009, as was historically used for sponsors for the 2008 – 2009 Athletic Year.  BSP will be responsible for reimbursing University for the cost, if any, of parking passes in excess of the historical number used for sponsors.  Said tickets and parking passes shall be of the same or better quality as to locations previously provided by University.  In this regard, University recognizes that as additional revenue is generated by BSP, under the terms of this Agreement, BSP's tickets and parking needs will

29

addition, University will provide at no cost to BSP, three (3) VIP football parking passes.

**3.2  Existing Agreements.**  University has executed various advertising and sponsorship agreements, some of which extend past the 2007-2008 season and will now be by virtue of this Agreement assigned, managed, serviced, sold or re-sold by BSP, beginning with the 2008 – 2009 Athletic Year, all of which are set forth on Schedule 3.2 of this Agreement, and which have been included in the rights fee consideration set forth in Section 4.1 and all of the revenue derived therefrom shall belong to BSP ("Existing Agreements").  University will continue to provide BSP fulfillment benefits at the current historical levels under each of the Existing Agreements throughout the Term of this Agreement, including tickets, hospitality, suite access, parties, trips, signage, merchandise, donor club memberships, etc.  BSP shall work with University in order to maintain the Existing Agreements and to obtain renewals of such agreements.  If University collects any revenue from any Existing Agreements, it shall notify BSP and the revenue collected by University shall be deducted from the Guaranteed Rights Fee.  All opportunities and rights, which historically have belonged to University (excluding those opportunities and rights under the Existing Agreements which have been used by University to promote ticket sales and University or University events or accomplishments) shall belong to BSP for its sponsorship needs.

**3.3  Excluded Categories of Sponsorships.**  BSP agrees that it shall not sell the following categories of sponsorship and advertising throughout the entire Term of this Agreement, unless otherwise agreed to by University:

- liquor (except wine and malt beverage);
- prophylactics;

31

- erectile dysfunction medication;

- feminine hygiene products;

- tobacco products;

- bail bonds; and

- sexually explicit material.

The foregoing categories are hereafter referred to as the "Excluded Categories." The list of Excluded Categories is not meant by University to be exclusive. In the event that University hereafter deems some other category of sponsorship or advertising to be offensive to University, it shall notify BSP of the specific category of advertising or sponsorship which University believes is offensive to the University ("Offensive Inventory") and it shall be added to the list of Excluded Categories. To the extent the Offensive Category is then in place or was sold by BSP but not yet in place, there shall be a corresponding dollar-for-dollar reduction in the Guaranteed Rights Fee under Section 4.1 for the amount of revenue lost by BSP from the Offensive Inventory becoming a part of the Excluded Categories.

3.4 **Casino Sponsors**. The sale of sponsorships by BSP to casinos and casino/resorts shall be permissible; provided, however, BSP shall refrain from selling sponsorships that refer directly and only to sports books or other similar betting. The University prefers that companies in this category be referenced to by their name, without reference to the word casino, in all in-stadium and print advertising efforts.

**3.5 Parking and Travel:**

a) University will provide BSP, at cost, parking on all business days at or immediately adjacent to University athletic facilities. University will also provide appropriate credentials and

32

parking on all game days for BSP's staff members and its senior executives, in a manner similar to that provided by University to its senior staff.

b)   University will make best efforts to provide BSP with space on any chartered aircraft carrying the University's football and men's and women's basketball teams, for up to four (4) people for BSP's client development.

3.6   **Office Space.**   BSP has or will be moving from its existing office space in the University's athletic department.   University has plan to build a new building on its campus which will house some or all of its athletic department personnel ("New Facility").   University acknowledges and agrees that BSP's performance under this Agreement and the resulting benefits to University will be better enhanced if BSP is provided office space in the New Facility. If the New Facility is built, University will provide BSP appropriate office space in the New Facility sufficient in size to accommodate four (4) full-time employees, one (1) intern and corresponding office equipment during the remainder of the Term of the Agreement ("Leased Premises") at a monthly rental not to exceed $1,000 per month ("Rent").   The Leased Premises shall be completely built out at University's cost and expense but any further changes or enhancements relative to the Leased Premises and furniture therein shall be at the sole cost and expense of BSP and with respect to changes or enhancements shall be at the prior written consent of University.   Additionally, the location of the Leased Premises shall be subject to University's sole and reasonable discretion.   If the Leased Premises are provided by University, it will provide internet hook-up, phone access, and telephones access to BSP in the Leased Premises with the costs of such services to be tracked by University and reimbursed monthly by BSP.   In no event shall BSP be responsible for paying any other expenses relating to the Leased

33

Premises other than the Rent and out-of-pocket expenses such as phone charges and office supplies. If BSP needs to expand its staff to carry out its responsibilities under this Agreement, subject to availability, University shall make a good faith effort to provide BSP additional office space, at an agreed upon rental, to accommodate such need and, at University's sole and reasonable discretion, in reasonable proximity to BSP's Leased Premises, or in different space large enough to accommodate all of BSP's needs.

**3.7    Efficient operation.**   Except as otherwise provided in this Agreement, BSP will furnish all labor, management, supplies, and equipment necessary to fulfill its obligations herein; provided, however University will provide non-financial assistance for sponsorship fulfillment and execution (principally, execution of game-day promotions for BSP's sponsors) at no expense to BSP.

**3.8    Permits.**   BSP will be financially responsible for obtaining all required permits, licenses, and bonds to comply with pertinent University rules and policies and municipal, county, state and federal laws, and will assume liability for all applicable taxes including but not restricted to sales and property taxes.

**3.9    Successful Performance.**   Recognizing that successful performance of this Agreement is dependent on mutual cooperation between BSP and University, BSP will meet periodically with University to review BSP's operations pursuant this Agreement and make necessary adjustments.

**3.10    Blogs.**   University acknowledges and agrees that it is the exclusive right of BSP to provide ongoing, regular and real time coverage of University athletic events which not only includes the game itself but also includes pre-game, half-time, quarter breaks and post-game

34

broadcasts ("Game Coverage"). University further acknowledges that the right to provide any type of commercial sponsorship or promotion in such "game coverage" on a blog or other similar means which features, describes, includes or discusses any University team in action as it occurs or "Game Coverage" (including any pre-games, half-time, quarter breaks or post-game) is an exclusive right belonging solely to BSP ("Blog Sponsorship"). If either University or BSP become aware of any blog which includes blog or blog-type Game Coverage or Blog Sponsorship or a blog which violates the Conference Policy (collectively a "Violating Blog"), University will act swiftly to arrive at a satisfactory solution to eliminate the Violating Blog.

   **4.1   Guaranteed Rights Fee.** As payment for the rights granted under this Agreement, BSP will pay University a Guaranteed Rights Fee in such amounts as set forth below. The Guaranteed Rights Fee described below is based upon all of the following assumptions being accurate (collectively the "Assumptions"): (a) that at a minimum, the inventory available to BSP for sponsorship sales shall be not less than the inventory which was available for sponsorships for the 2007 – 2008 Athletic Year ("Base Sponsorship Inventory"); and (b) all of the exclusive rights held by the University's athletic department and granted to BSP under this Agreement are available to BSP throughout the Term. If either or both of the Assumptions do not occur, or remain in effect for the entire Term of the Agreement, the Guaranteed Rights Fee will be adjusted downward on a dollar-for-dollar basis. If the Base Sponsorship Inventory or elements are materially reduced or eliminated, University will either replace inventory or alleviate those issues specifically identified by BSP in writing associated with such inventory to BSP's reasonable satisfaction, which shall not be unreasonably withheld, failing which the Guaranteed Rights Fee amount shall be reduced on a dollar-for-dollar basis should the University and BSP

35

fail to negotiate a mutually acceptable remedy. All Guaranteed Rights Fees owed by BSP shall be paid one-half on December 31 and one-half on June 30 of each Athletic Year with a final distribution of any income derived through the agreed AGR formula or other adjustments made on or before August 31st of each Athletic Year.

| Athletic Year | Guaranteed Rights Fee |
|---|---|
| 2008 – 2009 | $1,795,000 |
| 2009 – 2010 | $1,870,000 |
| 2010 – 2011 | $1,970,000 |
| 2011 – 2012 | $2,070,000 |
| 2012 – 2013 | $2,170,000 |
| 2013 – 2014 | $2,270,000 |
| 2014 – 2015 | $2,370,000 |
| 2015 – 2016 | $2,470,000 |
| 2016 - 2017 | $2,570,000 |
| 2017 – 2018 | $2,670,000 |
| 2018 – 2019 | $2,770,000 |

For the 2008-09 Athletic Year BSP will invoice and collect the revenue from Toyota ("Toyota Agreement"). Thereafter, if Toyota renews the Toyota Agreement with University utilizing its current inventory levels, BSP will manage the relationship with Toyota and invoice, collect and pass through to University the net amount of dollars connected to the existing inventory and revenue under the Toyota Agreement. Furthermore, if during the term of the

36

Toyota Agreement or in subsequent agreements with Toyota, BSP sells Toyota additional inventory, then BSP shall keep any additional revenue generated from the sale of such new inventory and the additional revenue shall be added to the annual calculation of the AGR. If, however, Toyota discontinues the Toyota Agreement, BSP will have no liability for specific replacement of the revenue from Toyota.

    **4.2   Trade Income.** BSP will endeavor to renew each year up to the same amount of historical in-kind, trade benefits which existed in the Original Agreement (approximately $200,000 net) for University in each contract year ("Threshold Amount"). Media trades included in this amount may be handled by University upon mutual agreement of both Parties. At University's request, BSP will further secure each year $75,000 in additional in-kind trade benefits above the Threshold Amount ("Additional Trade Amount"). BSP will receive a credit against the Guaranteed Rights Fee under Section 4.1 of this Agreement of $.60 on every dollar of the fair market value of any additional trade benefits above the Threshold Amount and the Additional Trade Amount which are provided to University by BSP. BSP reserves the right to substitute alternative inventory to current trade customers if those customers are otherwise displacing potential cash paying customers. All trade agreements must be approved by University. BSP shall have the opportunity to secure trade benefits to offset cash expenditures; the amount of the trade benefits will be reasonable and customary. University will be responsible for all merchandising elements necessary to fulfill trade benefits included in the Threshold Amount and Additional Trade Amount.

    **4.3  Reduction to Guaranteed Rights Fee**. Notwithstanding anything contained in this Agreement to the contrary, in addition to any other provisions of this Agreement which

37

provide for a reduction or a re-negotiation in the Guaranteed Rights Fee, a fair and equitable reduction in the Guaranteed Rights Fee will be agreed upon by BSP and University if any one or all of the following events occur and thereby reduce BSP's revenue during the Term of this Agreement, which reduction will be negotiated in good faith by the Parties; provided however, a reduction in the Guaranteed Rights Fee for an event which occurs under subsection e below will be calculated as set forth in subsection e:

a.     University's football, men's or women's basketball or baseball teams incur sanctions which prevent any of them from appearing in conference championship games or post season conference, NCAA, or NIT tournaments (basketball) or playoff/bowl games (football) or world series (baseball) or reduces the number of scholarships which can be offered; or

b.     The football, men's basketball, women's basketball, or baseball programs are no longer a member of the Western Athletic Conference (or any other conference); or

c.     One or more of University's major athletic programs (i.e., football, men's basketball, women's basketball, or baseball) is eliminated or substantially curtailed;

d.     Should any acts of terrorism, acts of state or the United States, strikes, labor shortages, epidemics or any natural disaster, including, but not limited to, flood, fire, earthquake, tornado, hurricane or extremely severe weather condition, drought, loss of power, whether or not resulting from a natural disaster, prevent a University home or neutral site game being played at its originally scheduled athletic venue at its originally scheduled time. However, the Parties recognize that the University reschedule a game at a different date or time in an effort to keep the game as a home game instead of moving the location of the game to the visiting team's home venue or moving the game to a neutral venue; or

38

| | |
|---|---|
| 2010 – 2011 | $5,275,000 |
| 2011 – 2012 | $5,475,000 |
| 2012 – 2013 | $5,675,000 |
| 2013 – 2014 | $5,875,000 |
| 2014 – 2015 | $6,075,000 |
| 2015 – 2016 | $6,275,000 |
| 2016 – 2017 | $6,475,000 |
| 2017 – 2018 | $6,675,000 |
| 2018 – 2019 | $6,875,000 |

Notwithstanding anything contained in this Section 5.1 or elsewhere in this Agreement to the contrary, if an Adjustment Event or Adjustment Events occur, the Revenue Share Hurdle amounts set forth above will likewise be adjusted to reflect the loss of revenue incurred by BSP under this Agreement. The amount of such adjustments shall be negotiated in good faith by the Parties.

**5.2   Olympic Sports Subsidy.** Beginning with the 2009 – 2010 Athletic Year and for each year thereafter during the Term, BSP will provide University with a marketing subsidy for its Olympic sports in the amount of $25,000 ("Marketing Subsidy"). Subject to the provisions of Section 2.10.1 relating to volleyball programs, University and BSP will mutually agree prior to each Athletic Year as to how the Marketing Subsidy for University's Olympic sports will be allocated and spent. BSP will have the exclusive right to sell sponsorships surrounding the Olympic sports and BSP will pay all costs associated therewith from the Marketing Subsidy.

40

e.     If BSP is not permitted to sell any and all categories of sponsorship not specifically prohibited herein, to sell to any and all sponsors, and to continue to sell all inventory managed or sold by BSP at any time during the Term of this Agreement (collectively the "Contract Categories"). If BSP is ever prevented from selling any Contract Categories not specifically prohibited herein for any reason through no fault of BSP (fault being limited to a sponsor no longer wishing to be a sponsor), a dollar-for-dollar credit and reduction in the amount of revenue lost from any contract or revenue received within the Contract Categories shall be made from the Guaranteed Rights Fee in recognition of BSP's loss of revenue; or

f.     If BSP is prevented from selling a sponsorships (including athletic department logo usage) in the same manner in which it has historically been provided;

g.     Should any other event described in this Agreement which provides for the reduction of the Guaranteed Rights Fee occur.

**All of the events described in this Section 4.3 and elsewhere in this Agreement which give rise to a reduction in the Guaranteed Rights Fee are hereafter singularly referred to as "Adjustment Event" and collectively referred to as "Adjustment Events".**

**5.1   Supplemental Compensation Plan and Revenue Sharing.** In addition to the annual Guaranteed Royalty Fee, BSP will pay University 50% of collected AGR that exceeds the Revenue Share Hurdle amount set forth below.

| Athletic Year | Revenue Share Hurdle |
|---|---|
| 2008 – 2009 | $4,925,000 |
| 2009 – 2010 | $5,075,000 |

39

**6.1   General Terms and Conditions.**   The terms and conditions contained in this Agreement will govern and will take precedence over any different or additional terms and conditions which BSP may have included in any documents attached to or accompanying this Agreement. Any handwritten changes on the face of this document will be ignored and have no legal effect unless initialed by both Parties.   The terms and conditions of this Agreement supersede and replace in their entirety the terms and conditions of the Original Agreement and the Amendment (collectively the "Prior Agreements") from and after the Effective Date.  The Parties agree and acknowledge that neither of the Parties are in breach of the Prior Agreements and both Parties have fulfilled all of their obligations under the Prior Agreements.

**6.2   Choice of Law, Forum Selection, Entire Agreement and Amendment.** This Agreement will be construed under California law (without regard for choice of law considerations).   This Agreement constitutes the entire agreement and understanding of the Parties and replaces any prior or contemporaneous agreement, whether written or oral including the Prior Agreements. No amendments to this Agreement will be effective unless in writing and signed by BSP and by University.  Courts located in the State of California shall have exclusive jurisdiction over any disputes relative to this Agreement.

**6.3   Assignment.**  BSP may not assign any rights or obligations of this Agreement without the prior approval of University, which approval will not be unreasonably withheld.  This Agreement will be binding upon BSP, and its successors and assigns, if any.   Any assignment attempted to be made in violation of this Agreement will be void.  Notwithstanding anything contained in this Section 6.3 to the contrary, BSP will have the right to assign this

41

Agreement and its rights and obligations hereunder to an entity it either controls (owns more than 50%) or manages.

6.4   **Termination.**  Either Party may terminate this Agreement in whole or in part for cause upon ninety (90) days written notice if the other party fails to comply with any material term or condition of this Agreement, becomes insolvent or files for bankruptcy protection, or fails to comply in a material way with the requirements of this Agreement.  Notwithstanding anything contained in this Section 6.4 to the contrary, the terminating Party must state with particularity the specific matters of the other party's non-compliance, whereupon the other party shall have ninety (90) days to cure such matters, or such longer period if said other party is diligently pursuing a cure.  In the event of any material noncompliance on the part of BSP, BSP shall continue to pay its Guaranteed Rights Fee under this Agreement unless BSP's noncompliance is a result in whole or in part by the actions or inactions of University; provided, however, any rights fee, or similar fee collected by University for the same period covered by this Agreement from any third party or if University elects to administer the rights herein itself, shall offset BSP's obligation to pay the Guaranteed Rights Fee by such amounts.

6.5 **Independent Contractor.**  BSP will perform its duties hereunder as an independent contractor and not as an employee of University.  Neither BSP nor any agent or employee of BSP will be or will be deemed to be an agent or employee of University  BSP will pay when due all required employment taxes and income tax withholding, including all federal and state income tax and any monies paid pursuant to this Agreement.  BSP and its employees are not entitled to tax withholding, worker's compensation, unemployment compensation, or any employee benefits, statutory or otherwise from University.  BSP will be solely responsible for

42

the acts of BSP, its employees and agents. BSP shall provide worker's compensation for all its employees and indemnify and hold University harmless therefrom.

**6.6   Non-Waiver.** No waiver by any Party of any default or nonperformance will be deemed a waiver of subsequent default or nonperformance.

**6.7   Audit and Retention of Books and Records.** University will have the right upon reasonable notice to BSP, (not more than once per year, and once during the year following the termination of this Agreement) to inspect and copy such books, records, and documents (in whatever medium they exist) related solely to the calculation of the AGR under this Agreement. BSP will make such items available for inspection during normal business hours at Learfield's principal place of business. All such items will be retained by BSP during the Term of this Agreement and for a period of one (1) year after the delivery of the goods and/or services. Any items relating to a claim arising out of the performance of this Agreement will be retained by BSP, its agents and subcontractors, if any, until the claim has been resolved.

**7.1   University Information; BSP Information.** BSP agrees that any information it receives during the course of its performance, which concerns the personal, financial, or other affairs of University, its trustees, officers, employees or students will be kept confidential and in conformance with all state and federal laws relating to privacy. University agrees that any information it receives from BSP under this Agreement which concerns the personal, financial or other affairs of BSP, its members, stockholders, officers, directors, employees and sponsors including, but not limited to, sales summaries, revenue sharing reports, settle-up documents and any other documents relating to the reporting of financial and sales information by BSP to University will be kept confidential and in conformance with all state and federal laws relating to

43

privacy, except if considered a legal request under the California Public Records Act, if applicable. If a third party makes a request for any information relating to this Agreement and University believes it is legally obligated to provide such information to such party, before doing so, University shall give BSP the opportunity to review the request and provide University with the reason(s) why the information should not be disclosed whereupon the Parties and/or their respective legal counsel will discuss the request and whether University is legally obligated to comply with the requirement before University complies with the request.

7.2   **Insurance.** At all times during its performance under this Agreement, BSP will obtain and keep in force comprehensive general and professional liability and general liability insurance, including coverage for death, bodily or personal injury, property damage, including products liability, libel and slander, and automobile coverages, with limits of not less than $1,000,000 each claim and $1,000,000 each occurrence. All certificates evidencing such insurance, will be provided to University upon its request, will name University and its trustees, officers and employees as additional insureds, and will provide for notification to University within at least thirty (30) days prior to expiration or cancellation of such insurance. BSP represents that it has worker's compensation insurance to the extent required by California law.

7.3   **Indemnification.** BSP agrees to defend, indemnify and hold harmless the University, its trustees, faculty, students, employees and agents from all liability, injuries, claims or damages (including claims of bodily injury or property damage) and loss, including costs, expenses, and attorneys' fees, which arise from the negligent acts and omissions of BSP, its employees, officers and agents under this Agreement. University agrees to defend, indemnify and hold harmless BSP, its members, employees, officers, directors and agents from all

44

liabilities, injuries, claims or damages (including claims of bodily injury or property damage) and loss, including costs and expenses, and attorneys' fees, which arise from the negligent acts or omissions of University, its trustees, faculty, students, employees and agents.  In the event of litigation by either party to enforce the terms and conditions of this Agreement, the prevailing party will be awarded costs and reasonable attorneys' fees.

7.4   **Notices/Administration.**   Except as otherwise provided in this Agreement, all notices, requests and other communications that a party is required or elects to deliver will be in writing and delivered personally, or by facsimile or electronic mail (provided such delivery is confirmed), or by a recognized overnight courier service or by United States mail, first-class, certified or registered, postage prepaid, return receipt requested, to the other party at its address set forth below or to such other addresses as such party may designate by notice given pursuant to this section:

**If to University :**
California State CSUFAC, Fresno Athletic Corporation
Attention:  Thomas Boeh, Athletics Director
1510 E. Shaw Avenue
Suite 103
Fresno, CA 93740
Facsimile No: (559) 278-6847
E-Mail Address:  tboeh@csufresno.edu

**If to BSP:**
Bulldog Sports Properties, LLC
c/o Learfield Communications, Inc.
Attention:  Greg Brown
2400 Dallas Parkway, Suite 500
Plano, TX 75093
Facsimile No:  (469) 241-0110
E-mail Address:  gbrown@learfield.com

**With a copy to:**

45

Philip A. Kaiser
The Kaiser Law Firm, P.C.
12231 Manchester Road, First Floor
St. Louis, MO 63131
Facsimile No: 314-966-7744
E-mail Address:  phil@kaiserlawfirm.com

**7.5   Severability.**  If any provision of this Agreement is invalid or unenforceable with respect to any party, the remainder of the Agreement, or the application of such provision to persons other than those as to which it is held invalid or unenforceable, will not be affected and each provision of the remainder of the Agreement will be valid and be enforceable to the fullest extent permitted by law.

**7.6   Survivability.**  The terms, provisions, representations, and warranties contained in this  Agreement that by their sense and context are intended to survive the performance thereof by any of the parties hereunder will so survive the completion of performance and termination of this Agreement, including the making of any and all payments hereunder.

**7.7   Force Majeure.**  Except as otherwise provided in this Agreement, and in particular Section 2.11.3, neither Party will be considered to be in default of its delay or failure to perform its obligations herein when such delay or failure arises out of causes beyond the reasonable control of the Party.  Such causes may include, but are not restricted to, acts of God or the public enemy, including, but not limited to, acts of terrorism, acts of state or the United States in either its sovereign or contractual capacity, fires, floods, epidemics, strikes and unusually severe weather; but in every case, delay or failure to perform must be beyond the reasonable control of and without the fault or negligence of the Party..

46

**7.8  Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which will constitute one Agreement.

**7.9  Non-Solicitation by University.**   University agrees that during the Term of this Agreement, including any extension of the Term, and for a period of twenty-four (24) months, after its termination, irrespective of the reason for its termination, University shall not directly or indirectly, hire or solicit an officer, general manager, assistant general manager, or account executive of BSP or encourage any such person to terminate its relationship with BSP. University acknowledges that its breach of this section shall entitle BSP to injunctive relief.

**7.10  Headings.**   The headings of the sections of this Agreement are used for convenience only and do not form a substantive part of the Agreement.

**7.11  Injunctions.**  In addition to any other remedies permitted by law, should either party violate the terms set forth herein, the violating party shall be entitled to injunctive relief against the other to restrain any further violation of these provisions.  Should either party be successful in this endeavor, the other party shall pay all costs and expenses associated therewith, including reasonable attorney's fees.

**7.12  University's Representations and Warranties Regarding BSP's Rights Under this Agreement.**  University represents and warrants to BSP that (a) University has the absolute right to grant and license the rights described herein to BSP, assign the Existing Agreements to BSP and provide BSP all of the benefits described in this Agreement (collectively the "Licensed Rights and Benefits"); (b) there are no oral or written agreements, contracts, options or other documents of any kind which University has entered into which would in any way impair or inhibit BSP from exercising the Licensed Rights and Benefits on an exclusive basis; (c)

47

but is not limited to, player features, other features, and the video season ticket and highlight packages.

    **8.3**   Whenever consent or approval is required, that consent or approval shall not be unreasonably withheld.

    **8.4**   Throughout the Term of this Agreement, BSP agrees that it will abide by the then existing NCAA rules and regulations in fulfilling BSP's obligations under this Agreement.

49

University is authorized to timely carry out and/or fulfill any obligation of University to BSP under this Agreement; (d) University will not directly or indirectly license in whole or in part the Licensed Rights and Benefits to a third party or make use of the Licensed Rights and Benefits for itself and (e) except for any existing agreements with the Western Athletic Conference, the NCAA, radio station KFIG or the Association Exclusive Sponsorship Agreements listed on Schedule 1.4, which were in effect on the Effective Date, copies of which have been provided to BSP, University has not entered into any agreements with any third party which grants exclusive or non-exclusive intercollegiate athletic sponsorship or broadcast rights to any third party. Throughout the Term, except as otherwise specifically provided in this Agreement, University shall not directly or indirectly grant any third party any of the Licensed Rights and Benefits granted to BSP under this Agreement. University will protect the rights granted to BSP herein. Notwithstanding anything contained in this Agreement to the contrary, if University materially breaches the provisions of this Section 7.12, an adjustment to the Guaranteed Rights Fee that BSP will pay University under this Agreement shall be negotiated in good faith in order to recognize and account for the revenue that cannot be obtained by BSP as a result of such material breach.

### 8.0 Miscellaneous.

**8.1** "Historical Levels" shall mean levels under the Original Agreement, historical levels from the University and historical levels from vendors with whom University presently contracts.

**8.2** BSP shall have exclusive rights to all video rebroadcasts except as otherwise set forth in this Agreement. University shall produce all video, which includes by way of example,

48

**IN WITNESS WHEREOF**, BSP and University have entered into this Agreement as of the date specified above with the understanding that this Agreement is effective as the Effective Date.

**The California State University,**
**Fresno Athletic Corporation**

**Bulldog Sports Properties, LLC**

By: Learfield Communications, Inc., its Sole Member

By: _____

By: _____

Name: Thomas Boeh

Name: Greg Brown

Title:   Director of Athletics

Title:  President, Learfield Sports

Dated: _____, 2009

Dated: _____, 2009

By: _____

NAME:  PAUL A. OLIARO

TITLE:  CHAIR, Athletic Corporation
          BOARD of DIRECTORS

DATE:  July 7, 2009

50

## SCHEDULE 3.2

### Existing Agreements

Pepsi

52

## SCHEDULE 1.4

### List of Exclusive Agreements with Association

Pepsi
Save Mart

51

# EXHIBIT B

**FIFTH AMENDMENT**
**TO**
**MULTI-MEDIA RIGHTS AGREEMENT**

BETWEEN

CALIFORNIA STATE UNIVERSITY, FRESNO ATHLETIC CORPORATION, a State
Institution of Higher Education ("University")

AND

BULLDOG SPORTS PROPERTIES, LLC, a single member limited liability company wholly-
owned by Learfield Communications, d/b/a Bulldog Sports Properties ("BSP").

RECITALS

A.   The University and BSP entered into the Multi-Media Agreement ("Agreement") effective
July 1, 2004; and

B.   The Agreement was amended (the "First Amendment") on May 22, 2006; and

C.   The Agreement was amended and restated in its entirety ("Second Amendment") on July 13,
2009; and

D.   The Agreement was further amended ("Third Amendment") as of the 9th day of April 2011;
and

E.   The Agreement was further amended ("Fourth Amendment") as of the 1st day of July 2012;
and

F.   The University and BSP wish to amend the Agreement by this Fifth Amendment to extend
the Term and provide for a capital subsidy that BSP will pay to the University over the Term
in accordance with the terms herein; and

G.   The Fresno State Administration has specifically exempted this Fifth Amendment from the
requirement that the University competitively procure the services BSP has been providing
and will provide under this Fifth Amendment; and

H.   Capitalized terms used in this Fifth Amendment shall have the same meaning as those terms
have in the Second Amendment unless otherwise noted.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable
consideration, the parties amend the Agreement by this Fifth Amendment effective as of the ___ day of
March, 2015 as follows:

1.   **Term.** Section 1.1 of the Agreement is hereby deleted in its entirety and replaced with
the following:

1

This Agreement will begin on the Effective Date and will continue until June 30, 2026 ("*Term*"), unless otherwise terminated as provided herein. Each contract year of the Agreement shall commence on July 1 and end on June 30 and each such period shall sometimes hereinafter be referred to as an "*Athletic Year*." No later than July 1, 2024, the University shall meet with BSP and engage in good faith negotiations regarding an extension of this Agreement beyond the Term. "Good faith negotiations" shall mean, at a minimum, submitting reasonable extension offers to the other Party. If no agreement on an extension of the Term is reached by the Parties by October 1, 2025, then the University shall be permitted to solicit offers from and engage in negotiations with third parties with respect to the Multi-Media Rights for the period after the Term; *provided, however*, BSP shall have a right of first refusal with respect to any offer received from a third party (a "*Third Party Offer*"). Prior to entering into any binding agreement with a third party, at any time during or after the Term, regarding any of the Multi-Media Rights, the University shall submit to BSP in writing the Third Party Offer it proposes to accept. If, within 30 days of receiving a copy of the Third Party Offer (the "*Matching Period*"), BSP notifies the University that it will agree to match the proposed contract period, guaranteed rights fee, revenue share hurdle and capital subsidy, if any (collectively, the "*Matchable Terms*"), then the University and BSP shall enter into a binding extension of this Agreement based on the Matchable Terms. If BSP notifies the University that it is not willing to match the Matchable Terms or if it fails to provide notice to the University within the Matching Period, then the University will be permitted to enter into an agreement with such third party on Matchable Terms no less favorable to the University than those set forth in the Third Party Offer provided to BSP. If the University fails to enter into a binding agreement with such third party within 60 days of the end of the Matching Period, then the University shall be required to proceed through the above process again prior to entering into any binding agreement with respect to any of the Multi-Media Rights. Prior to October 1, 2025, University will not solicit from or discuss with any third party the granting of the Multi-Media Rights. If an unsolicited offer or proposal for all or any part of the Multi-Media Rights is received by University prior to October 1, 2025, the University will promptly provide BSP with a copy of such offer or proposal and immediately thereafter destroy its contents, but in all events, University will not review it, reply to it or make use of it in any manner.

2.     **Guaranteed Rights Fee.** Paragraph 4.1 of the Agreement is hereby amended to revise the Guaranteed Rights Fee for Athletic Year 2015-2016 through Athletic Year 2020-2021, and provide for the Guaranteed Rights Fee for the period thereafter through the end of the Term. The Guaranteed Rights Fees for such periods shall be as follows:

| Athletic Year | Guaranteed Rights Fee |
|---|---|
| 2015-2016 | $2,525,000 |
| 2016-2017 | $2,595,000 |
| 2017-2018 | $2,695,000 |
| 2018-2019 | $2,795,000 |
| 2019-2020 | $2,945,000 |
| 2020-2021 | $3,095,000 |
| 2021-2022 | $3,245,000 |

2

| | |
|---|---|
| 2022-2023 | $3,395,000 |
| 2023-2024 | $3,545,000 |
| 2024-2025 | $3,695,000 |
| 2025-2026 | $3,845,000 |

All other provisions of Paragraph 4.1 of the Agreement shall remain unchanged.

3.   **Revenue Sharing.** Paragraph 5.1 of the Agreement is hereby amended to revise the Revenue Share Hurdle for Athletic Year 2015-2016 through Athletic Year 2020-2021, and provide for the Revenue Share Hurdle for the period thereafter through the end of the Term. The Revenue Share Hurdles for such periods shall be as follows:

| Athletic Year | Revenue Share Hurdle |
|---|---|
| 2015-2016 | $6,408,000 |
| 2016-2017 | $6,680,000 |
| 2017-2018 | $6,953,000 |
| 2018-2019 | $7,226,000 |
| 2019-2020 | $7,599,000 |
| 2020-2021 | $7,971,000 |
| 2021-2022 | $8,344,000 |
| 2022-2023 | $8,717,000 |
| 2023-2024 | $9,090,000 |
| 2024-2025 | $9,462,000 |
| 2025-2026 | $9,835,000 |

All other provisions of Paragraph 5.1 of the Agreement shall remain unchanged.

4.   **Olympic Subsidy; Scoreboard Subsidy.** The Parties acknowledge that, historically, BSP has paid the University a Marketing Subsidy for Olympic sports and a subsidy for the construction of a new scoreboard at the University's soccer/lacrosse stadium. These subsidies have been included within the Guaranteed Rights Fee set forth above. As a result, Section 5.2 of the Second Amendment is hereby deleted in its entirety and of no further force or effect, and all provisions of the Third Amendment are hereby deleted in their entirety and of no further force or effect.

5.   **Capital Subsidy Payments for Signage Upgrades.** BSP will make capital subsidy payments to the University during the following Athletic Years in the following amounts:

| Athletic Year | Capital Subsidy Payment |
|---|---|
| 2014 – 2015 | $200,000 |
| 2016 -- 2017 | $230,000 |
| 2017 -- 2018 | $230,000 |
| 2018 – 2019 | $230,000 |

3

BSP will make the Capital Subsidy Payment for the 2014-15 Athletic Year within thirty (30) days after the full execution of this Fifth Amendment. Each capital subsidy payment thereafter shall be paid prior to December 31 in the applicable Athletic Year. The University will use the Capital Subsidy Payments to install a new video board in the north end zone of the football stadium, fascia LED signage in the football stadium and to create other new or upgrade other existing signage (collectively, "Signage Upgrades") with the goal of creating additional sponsorship inventory which, when created, will be sold exclusively by BSP with the net revenue collected by BSP included in the calculation of AGR. The University will consult with BSP and ANC Sports Enterprises, LLC in value engineering the final design and programming content of the Signage Upgrades and will consult with BSP and give due consideration to BSP's input in the selection of the signage and technology provider for the Signage Upgrades.

6.    **OAS Rights.** Upon expiration of the University's current contract to manage its official athletic web site (the "OAS"), the University will give strong consideration to entering a new contract with SIDEARM Sports, LLC upon terms and conditions mutually agreed upon by the Parties.

7.    **Trademark Licensing.** The University acknowledges that the synergies that could be created if BSP, which holds the University's multi-media rights, or one of its affiliates also served as the University's trademark licensing agent, could result in increased awareness of the University's brand, which in turn could lead to increased sponsorship and licensing revenue. Therefore, the University will give strong consideration to using Learfield Licensing Partners, LLC ("LLP") as its trademark licensing partner when its current Licensing Agreement with Collegiate Licensing Company expires. If University agrees to enter into a licensing agreement with LLP, the term of that agreement will be coterminous with the Term of this Agreement.

8.    **Ticketing.** The University will give strong consideration to engaging IMG Learfield Ticket Solutions, LLC to assist the University with ticket sales for football and men's basketball games.

9.    **Relationship of Fifth Amendment to the Agreement.** Except as set forth in this Fifth Amendment, the Agreement shall remain unchanged and shall continue in full force and effect in accordance with its terms. If, however, there is any discrepancy or variance between the terms and conditions of this Fifth Amendment and the terms and conditions of the Agreement, this Fifth Amendment shall control.

10.    **Counterparts.** This Fifth Amendment may be executed in two or more counterparts and by facsimile or electronic signature, each of which shall be deemed an original and all of which shall constitute one document.

*REMAINDER OF PAGE INTENTIONALLY BLANK.*

*SIGNATURE PAGE FOLLOWS.*

4

IN WITNESS WHEREOF, the parties have entered into this Fifth Amendment as of the date first set forth above.

BULLDOG SPORTS PROPERTIES, LLC

By: LEARFIELD COMMUNICATIONS, INC.,
    Its Sole Member

By:_____
Name:
Title:

CALIFORNIA STATE UNIVERSITY,

FRESNO ATHLETIC CORPORATION

By:_____
Name: Jim Bartlos
Title: Director of Athletics

APPROVED BY:

By:_____
Name: Clinton G. Moffitt
Title: Board Chair.

5

# EXHIBIT C

DocuSign Envelope ID: F4D3757C-DDF8-42AA-BB1C-07654D47C656

SIXTH AMENDMENT
TO
MULTI-MEDIA RIGHTS AGREEMENT
BETWEEN
CALIFORNIA STATE UNIVERSITY, FRESNO ATHLETIC CORPORATION, a
California nonprofit public benefit corporation ("University")
AND
BULLDOG SPORTS PROPERTIES, LLC, a single member limited liability company wholly-
owned by Learfield Communications, LLC ("BSP")

RECITALS

A   The University and BSP entered into the Multi-Media Agreement effective July 1, 2004;
and

B.  The Agreement was amended (the "First Amendment") on May 22, 2006; and

C.  The Agreement was amended and restated in its entirety ("Second Amendment") on July
13, 2009; and

D.  The Agreement was further amended ("Third Amendment") as of the 9th day of April 2011;
and

E.  The Agreement was further amended ("Fourth Amendment") as of the 1st day of July 2012;
and

F.  The Agreement was further amended ("Fifth Amendment") in March of 2015 (the Multi-
Media Rights Agreement, as amended by the First, Second, Third, Fourth and Fifth
Amendments is hereinafter referred to as the "Agreement"); and

G.  Because of the COVID-19 pandemic and the material financial impact it has had on
intercollegiate athletic competitions during the 2020-2021 Athletic Year, specifically, the
multi-media revenue streams flowing therefrom that are the subject of the Agreement, the
University and BSP desire to amend the Agreement by this Sixth Amendment to modify,
among other things, various provisions of Agreement regarding the consideration to be
provided to the University in exchange for the Multi-Media Rights granted to BSP under
the Agreement; and

H.  University and BSP desire to further amend the Agreement by this Sixth Amendment to
add Healthcare (as defined below) as one of the categories of sponsorship that BSP shall
not be permitted to sell during the term pursuant to section 3.3 of the Agreement; and

I.  Capitalized terms used in this Sixth Amendment shall have the same meaning as those
terms have in the Second Amendment unless otherwise noted.

NOW, THEREFORE, in consideration of the foregoing Recitals and other good and valuable
consideration, the parties hereby amend the Agreement by this Sixth Amendment, effective
as of the 1st day of February 2021 upon its complete execution, as follows:

I.      The parties recognize and acknowledge that, pursuant to that certain Agreement dated
as of December 31, 2018 between Learfield Communications, LLC, IMG College, LLC,

-1-

Ataïros Group, Inc. and WME Entertainment Parent, LLC (the "Market Check Agreement"), that University has the right to conduct a "market check" or "market look" that could result in the Term of the Agreement ending as of June 30, 2024, in accordance with the terms and conditions of the Market Check Agreement.

II.   Section 3.3 of the Agreement is hereby amended to add "Healthcare" to the list of categories that BSP shall not sell throughout the Term, except (i) as otherwise agreed to by University and (ii) that BSP be permitted to sell/retain the sponsorships listed on Exhibit A to this Amendment. For purposes of the Agreement, "Healthcare" shall mean organizations engaged in the business of providing health care services in a hospital, clinic, physician's office, or other setting. Notwithstanding the foregoing, BSP shall be permitted to retain and renew the sponsorship of Sierra Pacific Orthopedics or the successor team physician for Fresno State Athletics. In connection with the University retaining the Healthcare category, University shall be permitted to provide any Healthcare partner it secures with the inventory listed on Exhibit B to this Amendment ("Healthcare Inventory"); provided, however, in the event the University does not have a Healthcare partner, such inventory shall revert to BSP to market and sell to other sponsors and potential sponsors for so long as University does not have a Healthcare partner. In consideration for BSP's agreement to make Healthcare an excluded category under Section 3.3, the parties have agreed that the Guaranteed Rights Fee will be reduced as follows: (i) in Athletic Year 2021-22, reduced by $550,000, (ii) in Athletic Year 2022-23, reduced by $605,000, and (iii) in Athletic Year 2023-24, reduced by $665,500. Such reductions are reflected in the amended Guaranteed Rights Fee schedule set forth below. The Guaranteed Rights Fee for Athletic Years 2024-25 and 2025-26 shall be as set forth below unless otherwise agreed to by the University and BSP and in accordance with the Agreement.

III.   Section 4.1 of the Agreement is amended so that the Guaranteed Rights Fees shall be as follows:

| Athletic Year | Guaranteed Rights Fee |
|---|---|
| 2015-2016 | $2,525,000 |
| 2016-2017 | $2,595,000 |
| 2017-2018 | $2,695,000 |
| 2018-2019 | $2,795,000 |
| 2019-2020 | $2,945,000 |
| 2020-2021 | (Refer to Section 5.1a below) |
| 2021-2022 | $2,695,000 |
| 2022-2023 | $2,790,000 |
| 2023-2024 | $2,879,500 |
| 2024-2025 | $2,879,500 |
| 2025-2026 | $2,879,500 |

IV.   The text of Section 5.1 that immediately follows the Revenue Share Hurdle table is deleted in its entirety and replaced with the following:

*Notwithstanding anything to the contrary contained in this Section 5.1 or elsewhere in this Agreement to the contrary but subject to Section 5.1.a below, if an Adjustment Event or Adjustment Events occur, the Revenue Hurdle amounts set forth above will likewise be adjusted to reflect the loss of revenue incurred by BSP under this Agreement. The amount of*

-2-

*such adjustments shall be negotiated in good faith by the Parties.*

V.  The following is added as subsection 5.1.a to the Agreement:

*5.1.a   Proportion of AGR to be paid by BSP to University for the 2020-2021 Athletic Year. Pursuant to Section 4.3 of the Agreement, the parties have agreed that, in lieu of the Guaranteed Rights Fee under Section 4.1 and revenue share under Section 5.1 of the Agreement, in Athletic Year 2020-21 BSP will pay University fifty-four percent (54%) of the AGR collected by BSP with respect to such Athletic Year. BSP agrees to provide University with documentation of all contracts currently executed for Athletic Year 2020-21. The parties agree that the parties' agreement on an adjustment for Athletic Year 2020-21 shall not be deemed a waiver or release by BSP of its right and remedies with respect to additional Athletic Years (under Section 4.3 or otherwise) as a result of the impact of COVID-19, all such rights and remedies are hereby expressly reserved. BSP shall pay such amount to University on or before August 31, 2021.*

VI.    **Counterparts.** This Sixth Amendment may be executed in two or more counterparts and by facsimile or electronic signature, each of which shall be deemed an original and all of which shall constitute one document.

*[Signature page follows]*

-3-

IN WITNESS WHEREOF, the Parties have entered into this Sixth Amendment as of the date first set forth above.

BULLDOG SPORTS PROPERTIES, LLC
By: LEARFIELD COMMUNICTIONS, LLC,
    Its Sole Member

By: Cole Gahagan (Apr 21, 2021 09:00 CDT)
    Name: ~~Jeff Bolithe~~ Cole Gahagan
    Title: President & CEO

CALIFORNIA STATE UNIVERSITY,
FRESNO ATHLETIC CORPORATION

By:
    Name: Terrance J. Tumey
    Title: Director of Athletics

APPROVED BY:

    Name: Deborah S. Adishian-Astone
    Title: Board Chair

-4-

DocuSign Envelope ID: F4D3757C-DDF8-42AA-BB1C-07654D47C656

Exhibit A

Existing Healthcare Related Sponsors

1. Allstate – Approved, if promotions, advertising, and signage is restricted to home and auto insurance programs only (no healthcare).

2. Central CA Blood Centers – Approved if standalone, but they cannot co-market/affiliate with another health system in connection with the sponsorship.

3. Fresno County Department of Behavioral Health - Approved if standalone, they cannot market/affiliate with another health system in connection with the sponsorship.

4. Pacific Dental Services – Approval applicable to existing dental sponsor (Pacific Dental) who is part of the Smile Generation network provided that if, at any time, a healthcare network were to take over the business/company then there would be an immediate conflict and the agreement would need to be terminated. Pacific Dental may not be affiliated with any health care system and their signage and promotions will need to be limited to general dentistry (no dental surgeries or pediatric dentistry). In addition, they would not be allowed to have an affiliation with any other healthcare or co-brand with another medical group.

5. Sierra Pacific Ortho (Official Team Physicians) - Approved.

6. Terraces at San Joaquin Garden (senior living) – Approved, but only as a standalone center. If at any time the center is sold or merged with a competing healthcare system, the sponsorship would need to be terminated and not renewed.

7. Bayer – Approved provided the sponsorship is not in partnership with the pharmaceutical division of the company, rather solely within the crop sciences division.

# EXHIBIT D

Learfield Communications, LLC

To:   CALIFORNIA STATE UNIVERSI   5296

Check Number:    0161455
Date:    06/29/2022

| Invoice Number | Date | | | ount | Discount | Paid Amount |
|---|---|---|---|---|---|---|
| PR - 06/23/22 | 06/23/2022 | | | 5.00 | $0.00 | $106,645.00 |

TOTALS:    $106,645.00    $0.00    $106,645.00

Learfield Communications, LLC

To:   CALIFORNIA STATE UNIVERSI   5296

Check Number:    0161455
Date:    06/29/2022

| Invoice Number | Date | Description | Amount | Discount | Paid Amount |
|---|---|---|---|---|---|
| PR - 06/23/22 | 06/23/2022 | RIGHTS FEES | $106,645.00 | $0.00 | $106,645.00 |

TOTALS:    $106,645.00    $0.00    $106,645.00

DOCUMENT IS PRINTED ON CHEMICALLY REACTIVE PAPER - THE BACK OF THIS DOCUMENT INCLUDES A TAMPER EVIDENT CHEMICAL WASH WARNING BOX

Commerce Bank
P.O. Box 1677
Columbia, MO 65205-1677

0161455

**Learfield Communications, LLC**
**505 Hobbs Road**
**Jefferson City, MO 65109**
**573-893-7200**

Pay    One Hundred Six Thousand Six Hundred Forty Five Dollars and 00 Cents

| DATE | AMOUNT |
|---|---|
| Jun 29, 2022 | $106,645.00 |

to the Order of:

VOID After 180 Days

**CALIFORNIA STATE UNIVERSITY-FRESNO**

ACCOUNTING OFFICE
5150 NORTH MAPLE AVENUE
JA58
FRESNO, CA 93740-8026

Page 81

# EXHIBIT E

| From: | John Raleigh <jraleigh@learfield.com> |
|---|---|
| Sent: | Friday, August 26, 2022 9:51 AM |
| To: | Debbie Adishian-Astone |
| Cc: | Abeles, Jerry |
| Subject: | RE: [EXT]  Following Up from Last Week's Call |
| Attachments: | Fresno State Impairment Update 082622.pdf; Fresno FY20 vs FY22 Account Comparison 8.25.22.xlsx |

You don't often get email from jraleigh@learfield.com. Learn why this is important

Debbie – Thanks for following back up. I do have the impairment support we discussed. Attached is a one-sheeter showing an overview of the COVID revenue step-back. You will see that we have calculated impairment in two different ways. The first (Method A) is to compare the year's revenue to pre-COVID (FY20) revenue and then add in the rights fee increase over that period. The second (Method B) is to show where sales would be absent COVID based on historical growth at the property. You will see that for FY22 both methods show relatively similar impairment numbers ($1.165M v. $1.117M).

I am also attaching an account-by-account review of COVID impairment. This shows a similar impairment number for FY22 of approximately $1.029 million. (You will see at the bottom of the spreadsheet we show the lost healthcare deals that we excluded because the University took back the category. Those deals are not included in the impairment calculation.)

Let's reconnect after you have had a chance to review the attached. We feel it is compelling evidence that COVID continues to significantly impact the property in a way that requires adjustment per the terms of our agreement.

I look forward to hearing from you.

Best,
John.

John H. Raleigh

 **LEARFIELD**

O: 469-241-9191 Ext. 1862

---

From: Debbie Adishian-Astone <debbiea@csufresno.edu>
Sent: Friday, August 26, 2022 11:27 AM
To: John Raleigh <jraleigh@learfield.com>
Cc: Abeles, Jerry <jerry.abeles@afslaw.com>
Subject: [EXT] Following Up from Last Week's Call

John,

Happy Friday! Just following up to our call last week where you agreed to provide a financial analysis to support the proposed reduction in MMR fees for FY 2021/22 based on Learfield's claim that sales efforts were slow to rebound due to uncertainty of COVID related impacts.

1

Case 1:23-cv-00549-ADA-SKO Document 1 Filed 04/07/23 Page 88 of 109

As we discussed last week, to lose the ADA-SKO concerning to Fresno State Athletics and based upon the contract language, and the fact that no games were cancelled due to COVID, and that there were no fan capacity restrictions from the CDPH or FCDPH that would have impacted large outdoor venues, and most importantly our agreement requires a minimum amount of guaranteed rights fees which has never been based on sales effort or lack of closing deals.

I truly hope Learfield will reconsider its current position based upon our long-standing relationship/partnership. We are not in a position nor is it contractually justified for us to take a "haircut" on the fees due to us.

Regards,
Debbie

Deborah S. Adishian-Astone
Vice President for Administration/Chief Financial Officer
California State University, Fresno

---------- Forwarded message ---------

From: **John Raleigh** <jraleigh@learfield.com>
Date: Thu, Aug 18, 2022 at 8:36 AM
Subject: RE: [EXT] Today's Call
To: Debbie Adishian-Astone <debbiea@csufresno.edu>

That's perfectly fine. I think it's a good idea, actually. Looking forward to connecting later today.

John H. Raleigh

**O**: 469-241-9191 Ext. 1862

---

**From:** Debbie Adishian-Astone <debbiea@csufresno.edu>
**Sent:** Thursday, August 18, 2022 10:20 AM
**To:** John Raleigh <jraleigh@learfield.com>
**Subject:** [EXT] Today's Call

John,

Good morning I wanted to check with you to see if you would have any concerns if our outside counsel Jerry Abeles from ArentFox Schiff could join our call this morning as the Athletic Corporation has retained them to assist us with this matter.

Please advise if you would still like to proceed with the call as I think it will be helpful for Jerry to hear directly how contractually Learfield feels they are not obligated to pay us the full Guaranteed Rights Fees for FY 2021/22.

Kind regards

Debbie

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

| Fresno State | TERM: | 2026 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22F | FY23F | FY24F | FY25F | FY26F | Total |
| Gross Revenue (current) | 3,932 | 4,210 | 4,354 | 4,409 | 4,567 | 4,147 | 2,075 | 3,282 | 3,744 | 3,856 | 3,972 | 4,091 | |
| | | 7% | 3% | 1% | 4% | -9% | -50% | 58% | 14% | 3% | 3% | 3% | |
| Gross Revenue (no Covid steady state) | | | | | | 4,147 | 4,272 | 4,400 | 4,532 | 4,668 | 4,808 | 4,952 | |
| | | | | | | -9% | 3% | 3% | 3% | 3% | 3% | 3% | |

**Impairment Detail (Method A & B)**

| | FY21 | FY22F | FY23F | FY24F | FY25F | FY26F |
|---|---|---|---|---|---|---|
| Revenue vs. FY20 | (2,072) | (865) | (403) | (291) | (175) | (56) |
| RF Increase | (150) | (300) | (395) | (480) | (484) | (484) |
| **A) Total Impairment (Rev + GRF vs FY20)** | (2,222) | (1,165) | (798) | (775) | (659) | (540) | | | | | | | (6,160) |
| **B) Total Impairment (Revenue Lost)** | (2,397) | (1,117) | (789) | (811) | (836) | (861) | | | | | | | (6,610) |

A) Impairment measured by the shortfall of Revenue each year vs. FY20 + GRF growth each year vs. FY20
B) Impairment measured by comparing current forecasted Gross Revenue vs. Steady State revenue growth from FY20

| | | | | | | FY20 | FY21 | FY22F | FY23F | FY24F | FY25F | FY26F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original GRF | | | | | | 2945 | 3095 | 3245 | 3395 | 3545 | 3695 | 3845 |
| HC Adjustment | | | | | | -550 | -550 | -550 | -605 | -666 | -816 | -966 |
| GRF | | | | | | 2395 | 2545 | 2695 | 2790 | 2879 | 2879 | 2879 |

Page 86

| Property | Fresno State | | | |
| Account Name | FY20 | FY22 | YOY Variance | Loss Due to COVID |
| --- | --- | --- | --- | --- |
| | | 6,000 | 6,000 | - |
| | 28 | | (28) | - |
| | 45,000 | 45,000 | - | - |
| | 57,000 | 57,000 | - | - |
| | 11,000 | 13,200 | 2,200 | - |
| | 484,500 | 400,000 | (84,500) | - |
| | 15,500 | | (15,500) | - |
| | 8,000 | | (8,000) | (8,000) |
| | 20,750 | 20,000 | (750) | - |
| | | 5,000 | 5,000 | - |
| | 17,500 | | (17,500) | (17,500) |
| | 110,000 | 19,000 | (91,000) | - |
| | | 10,200 | 10,200 | - |
| | 30,000 | 4,994 | (25,006) | (25,006) |
| | 40,000 | | (40,000) | - |
| | | 42,000 | 42,000 | - |
| | 25,000 | | (25,000) | (25,000) |
| | 14,000 | | (14,000) | (14,000) |
| | 25,250 | 26,000 | 750 | - |
| | 15,000 | | (15,000) | (15,000) |
| | 20,000 | 20,000 | - | - |
| | | 16,500 | 16,500 | - |
| | | 22,000 | 22,000 | - |
| | 124,000 | | (124,000) | (124,000) |
| | 22,500 | 23,500 | 1,000 | - |
| | 6,000 | | (6,000) | - |
| | | 5,000 | 5,000 | - |
| | 29,500 | 10,000 | (19,500) | (19,500) |
| | | 3,500 | 3,500 | - |
| | 66,000 | | (66,000) | (66,000) |
| | | 3,500 | 3,500 | - |
| | 3,000 | | (3,000) | - |
| | 20,000 | | (20,000) | - |
| | 38,535 | | (38,535) | (38,535) |
| | 10,000 | 10,000 | - | - |
| | 67,000 | 67,000 | - | - |
| | 15,000 | 17,250 | 2,250 | - |
| | 16,870 | | (16,870) | - |
| | 55,500 | | (55,500) | (55,500) |
| | | 20,000 | 20,000 | - |
| | 9,000 | | (9,000) | (9,000) |
| | 18,000 | | (18,000) | (18,000) |
| | 7,500 | | (7,500) | - |
| | 28,300 | | (28,300) | (28,300) |
| | | 58,500 | 58,500 | - |
| | 34 | | (34) | - |
| | 15,000 | | (15,000) | (15,000) |
| | | 12,500 | 12,500 | - |
| | | 5,000 | 5,000 | - |
| | 20,500 | | (20,500) | - |
| | 15,000 | 20,000 | 5,000 | - |
| | 19,000 | 3,500 | (15,500) | (15,500) |
| | 9,500 | | (9,500) | - |
| | 96,179 | 117,375 | 21,196 | - |
| | 10,300 | 10,300 | - | - |
| | | 13,952 | 13,952 | - |
| | | 16,000 | 16,000 | - |
| | 60,000 | 62,500 | 2,500 | - |
| | 11,500 | 12,000 | 500 | - |
| | 26,700 | | (26,700) | (26,700) |
| | 15,500 | | (15,500) | - |
| | 23,000 | 6,500 | (16,500) | (16,500) |
| | 15,000 | | (15,000) | (15,000) |
| | 8,000 | 10,000 | 2,000 | - |
| | 10,000 | | (10,000) | (10,000) |
| | 12,500 | | (12,500) | (12,500) |
| | 16,000 | | (16,000) | (16,000) |
| | | 2,142 | 2,142 | - |
| | | 5,000 | 5,000 | - |
| | 9,382 | | (9,382) | (9,382) |
| | | 1,150 | 1,150 | - |
| | 11,000 | | (11,000) | (11,000) |
| | 36,000 | 37,500 | 1,500 | - |
| | 500 | | (500) | (500) |
| | 37,000 | | (37,000) | - |
| | | 3,000 | 3,000 | - |
| | 16,875 | | (16,875) | - |
| | 2,000 | | (2,000) | - |
| | 2,000 | | (2,000) | - |

| Property | Fresno State | | | Loss Due to COVID |
|---|---|---|---|---|
| Account Name | FY20 | FY22 | YOY Variance | COVID |
| | | 20,000 | 20,000 | - |
| | | 10,000 | 10,000 | - |
| | 49,000 | 48,500 | (500) | - |
| | 5,000 | | (5,000) | - |
| | 15,000 | | (15,000) | (15,000) |
| | 160,000 | 165,000 | 5,000 | - |
| | | 10,000 | 10,000 | - |
| | 3,500 | 4,000 | 500 | - |
| | | 4,500 | 4,500 | - |
| | 34,500 | | (34,500) | (34,500) |
| | | 34,000 | 34,000 | - |
| | 4,200 | | (4,200) | (4,200) |
| | 249,855 | 220,855 | (29,000) | - |
| | 47,000 | 58,500 | 11,500 | - |
| | 57,800 | | (57,800) | - |
| | 10,000 | 10,000 | - | - |
| | 21,000 | 15,000 | (6,000) | (6,000) |
| | 9,000 | 20,000 | 11,000 | - |
| | 3,000 | | (3,000) | (3,000) |
| | | 23,500 | 23,500 | - |
| | | 7,650 | 7,650 | - |
| | 15,000 | | (15,000) | (15,000) |
| | 4,000 | | (4,000) | - |
| | 21,500 | 23,000 | 1,500 | - |
| | 19,800 | 35,000 | 15,200 | - |
| | 13,000 | 13,000 | - | - |
| | 5,000 | | (5,000) | (5,000) |
| | | 27,625 | 27,625 | - |
| | | 10,700 | 10,700 | - |
| | | 203 | 203 | - |
| | 72,500 | | (72,500) | (72,500) |
| | 5,000 | | (5,000) | - |
| | 29,500 | | (29,500) | (29,500) |
| | 82,750 | 64,000 | (18,750) | - |
| | 66,000 | | (66,000) | (66,000) |
| | 10,250 | 15,000 | 4,750 | - |
| | 26,000 | | (26,000) | (26,000) |
| | 110,000 | 111,000 | 1,000 | - |
| | 795,000 | 800,000 | 5,000 | - |
| | 30,000 | | (30,000) | (30,000) |
| | 25,000 | | (25,000) | (25,000) |
| | 18,000 | | (18,000) | (18,000) |
| | | 25,000 | 25,000 | - |
| | 15,000 | 15,000 | - | - |
| | 35,340 | | (35,340) | (35,340) |
| | | 9,000 | 9,000 | - |
| | | 50,000 | 50,000 | - |
| | | 20,000 | 20,000 | - |
| | 35,000 | 36,750 | 1,750 | - |
| | | 80,000 | 80,000 | - |
| | 4,679 | | (4,679) | - |
| | 17,475 | 14,300 | (3,175) | (3,175) |
| | 15,000 | | (15,000) | (15,000) |
| | 45,000 | | (45,000) | - |
| | 12,500 | | (12,500) | - |
| | 155 | | (155) | - |
| | | 6,000 | 6,000 | - |
| | 15,000 | | (15,000) | (15,000) |
| **Grand Total** | **4,186,007** | **3,270,646** | **(915,361)** | **(1,079,638)** |

| HEALTHCARE DEALS - 1920 - EXCLUDED | | | | |
|---|---|---|---|---|
| Industry | Health Care | | | Loss Due to COVID |
| Account Name | FY20 | FY22 | YOY Variance | COVID |
| | 15,000 | | (15,000) | N/A |
| | 310,000 | | (310,000) | N/A |
| | 68,250 | | (68,250) | N/A |
| | 50,000 | | (50,000) | N/A |
| | 19,500 | | (19,500) | N/A |
| | 58,500 | | (58,500) | N/A |
| | 25,000 | | (25,000) | N/A |
| | 24,000 | | (24,000) | N/A |
| **Grand Total** | **570,250** | | **(570,250)** | |

# EXHIBIT F

# ArentFox
# Schiff

**ArentFox Schiff LLP**

555 West Fifth Street
48th Floor
Los Angeles, CA 90013

| 213.629.7400 | **MAIN** |
| 213.629.7401 | **FAX** |

afslaw.com

October 3, 2022

VIA EMAIL

**Jerrold Abeles**
Partner

213.629.7407    **DIRECT**
jerry.abeles@afslaw.com

John H. Raleigh (jraleigh@learfield.com)
Chief Legal Officer
Learfield
2400 Dallas Parkway, Suite 500
Plano, TX 75093

Bulldog Sports Properties, LLC
c/o Learfield Communications, Inc.
Attn: Greg Brown (gbrown@learfield.com)
2400 Dallas Parkway, Suite 500
Plano, TX 75093

Philip A. Kaiser (phil@kaiserlawfirm.com)
The Kaiser Law Firm, P.C.
12231 Manchester Road, First Floor
St. Louis, MO 63131

Re:    Notice of Termination for Cause

Gentlemen:

We represent The California State University, Fresno Athletic Corporation ("Fresno State"),
which entered into an Amended and Restated Multi-Media Rights Agreement with Bulldog
Sports Properties, LLC ("Learfield") on or about July 13, 2009 (the "Contract"). Pursuant to
Section 6.4 of the Contract, Fresno State hereby gives notice of termination for cause due to
Learfield's failure to comply with its payment obligations under Section 4.1, a material term of
the Contract.

Section 4.1 specifies that Learfield is obligated to pay an annual Guaranteed Rights Fee in
exchange for the rights provided to Learfield under the Contract. In the Fifth Amendment to the
Contract, signed in March 2015, the Guaranteed Rights Fee for the 2021-2022 Athletic Year was
to be $3,245,000. In April 2021, the parties agreed to further amend the Contract. Due to impacts
of the COVID-19 pandemic and the elimination of Healthcare as a category of sponsorship that
Learfield could sell, the parties agreed to a reduction in the Guaranteed Rights Fee owed to
Fresno State. Consequently, the parties signed the Sixth Amendment to the Contract, and the
Guaranteed Rights Fee for the 2021-2022 Athletic Year was reduced by $550,000, to

**Smart In**
**Your World®**

Page 90

# ArentFox
# Schiff

October 3, 2022
Page 2

$2,695,000. By operation of the Sixth Amendment, the Guaranteed Rights Fee for ensuing years was reduced by at least $600,000 annually through the 2025-2026 Athletic Year.

Learfield paid Fresno State $1,347,500, the first half of its 2021-2022 obligation, on or around December 15, 2021. An additional equal payment was due no later than June 30, 2022. Rather than pay the amount owed, Learfield instead sent only $327,500. Learfield unilaterally and improperly withheld $1,020,000 from the amount owed on June 30, 2022. Learfield provided no advance notice to Fresno State that it would be withholding 38% of the guaranteed amount owed, thereby causing a massive and unanticipated reduction in the projected revenues for Fresno State for the fiscal year ending June 30, 2022.

Learfield had no legal or contractual right to withhold the second payment of $1,347,500. All of the reasons Learfield subsequently provided, which center on the financial impact to Learfield of its purported inability to sell, are not supported by the Contract, and thus do not justify Learfield's unilateral action. Nor are Learfield's excuses credible. While Learfield contends that it was not able to recruit sponsors for 2021-2022 due to lingering effects of COVID-19, that is not a valid reason for not honoring the obligation to pay the full amount of the Guaranteed Rights Fee, as all Fresno State athletic competitions for all sport teams occurred during the 2021-2022 year with no event restrictions. Additionally, the parties had already taken into account COVID-19 impacts for all subsequent contract years when they agreed, in the Sixth Amendment, to a substantial reduction in the Guaranteed Rights Fee based in part on "the COVID-19 pandemic and the material financial impact it has had on intercollegiate athletic competitions during the 2020-2021 Athletic year." Further, Learfield's own records confirm that it sold to 35 new sponsors in 2022 who had not sponsored the team in 2020, undermining Learfield's faulty logic and reasoning. John Raleigh's September 15, 2022 email confirms that Learfield has every intention of improperly withholding additional payments during all future years of the Contract. This is contrary to the Contract's plain language and simply unacceptable.

Pursuant to Section 6.4 of the Contract, Learfield has 90 days from this notice to cure by paying Fresno State $1,347,500 for 2021-2022. Please note that the same section requires Learfield to continue paying the Guaranteed Rights Fee to Fresno State during the 90-day cure period. This will constitute Fresno State's sole notice to Learfield about termination and the contractual opportunity to cure.

If you have any questions, please feel free to contact me.

Yours truly,

*Jerrold Abeles*

Jerrold Abeles

# EXHIBIT G

**John H. Raleigh**
Chief Legal Officer

 **LEARFIELD**

October 19, 2022

**BY EMAIL (speskind@kpmg.com)**
Jerrold Abeles
Arent Fox Schiff
555 West Fifth Street
48th Floor
Los Angeles, CA 90013

Re:     Amended and restated Multi-Media Rights Agreement, effective July 1, 2004, by and between California State University, Fresno Athletic Corporation ("Fresno State" or the "University"-) and Bulldog Sports Properties, LLC ("BSP"), as amended by the First Amendment dated May 22, 2006, the Second Amendment dated July 13, 2009, the Third amendment dated April 9, 2011, the Fourth Amendment dated July 1, 2012, the Fifth Amendment dated March 2015and the Sixth Amendment dated February 1, 2021 (collectively; the "Agreement")

Dear Mr. Abeles:

This letter is in response to your letter dated October 3, 2022 in which you assert that Fresno State has the right to terminate the Agreement. As explained below, Fresno State has no such right and any attempt by the University to terminate the Agreement will be a material breach by the University and subject the University to significant damages.

There can be no dispute that the COVID-19 global pandemic has had and continues to have a material adverse impact on the rights and inventory granted to BSP under the terms of the Agreement and BSP's ability to generate revenue therefrom. As we have shown you previously, BSP's revenue fell by approximately 50% in FY21 as a result of the pandemic and Fresno State's cancelation and postponement of events and implementation of severe attendance restrictions. This impact continued into FY22. As shown in more detail below, BSP's FY22 revenue was still not back to pre-pandemic levels, let alone to the level it would have achieved absent COVID-19.

As a reminder, Fresno State played two home football games in 2020, both of which were played in front of zero fans. Similarly, men's and women's basketball played reduced scheduled in front of zero fans at home. Softball, baseball, lacrosse and track and field all played with significant attendance restrictions (capping at 33% of capacity).

The effects of this shutdown resulted in a material reduction in BSP's revenue not only for 2020-21 but also for 2021-22. For instance, some multi-year sponsors chose to exit sponsorships and others declined to enter into sponsorships or renewals of sponsorships due to the pandemic and uncertainty regarding Fresno State's plans for the 2021-22 season. As a result, BSP lost the sponsorship and the accompanying revenues for 2020-21 and 2021-22. Given the ongoing and fluctuating nature of the pandemic during the 2021-22 sales cycle (the State of California is still under a COVID-19 state of emergency and has easily been the most impacted state in the country), there remained significant uncertainty as to whether Fresno State would stage home football, basketball and baseball games and if so, whether there would be attendance restrictions. As a result, sponsors continued to be hesitant to enter into, or invest at their previous levels of,

Learfield Communications. LLC. 2400 Dallas Parkway. Plano. TX   Tel. (469) 241-9191 Ext. 1862. Email: jraleigh@learfield.com

Page 93

sponsorships. In fact, Fresno State did not announce its attendance policy for the 2021 football season until **July 12, 2021,** well past the normal sponsorship selling season for football. And the University didn't announce its attendance policy regarding basketball until January 2022, and then the University required all fans to be vaccinated and wear a mask, which negatively impacted attendance.

The COVID pandemic also impeded BSP's ability to generate new business for FY22, both because BSP was not able to take prospective sponsors to games but also the general uncertainty about whether games would occur as scheduled (and with fans) in FY22. Additionally, in the multi-media rights business, sponsorships are sold on a multi-year basis and each year builds on the prior year. So, when the business takes a significant step back (as it did here in FY21), it takes time to build the business back to where it was prior to that step back let alone to where it would have been absent the impairment event. This is what we saw in FY22 and what we will likely see in FY23.

The ongoing impact of COVID-19 and the resulting shutdown of the Fresno State athletic programs is evidenced in BSP's financial results, which we have previously shared with you. BSP's pre-pandemic (i.e., FY20) revenue was approximately $4,147,000. As a result of the pandemic, BSP's revenue in FY21 dropped to approximately $2,075,000 (a 50% reduction). While there was substantial recovery in FY22, BSP's revenue still had not returned to a pre-pandemic level as it came in at approximately $3,300,000, or 79% of FY20 revenue.

And this of course does not take into account where revenues would have been absent the pandemic and Fresno State's shutdown of athletics. Even assuming a mere 3% annual growth rate (which is less than BSP's historical revenue growth at Fresno State), BSP's revenue in FY22 would have been approximately $4,400,000. This reflects an impairment for FY22 of more than $1,100,000.

BSP's FY22 revenue is not only not back to FY20 level, it is not even back to where it was in FY15. So the University is apparently asking BSP to pay a FY22 guarantee on FY14 revenue. Obviously, this would be grossly unfair and not required under the Agreement.

Fresno State's inability to deliver the assets and inventory required under the Agreement and the resulting impact on BSP's revenue requires an adjustment to the Guaranteed Rights Fee under Sections 4.1 and 4.3 of the Agreement. Fresno State specifically acknowledged this in the Sixth Amendment, which provides as follows:

> "Because of the COVID-19 pandemic and the material financial impact it has had on intercollegiate athletic competitions during the 2020-21, **<u>specifically, the multi-media revenue streams flowing therefrom</u>** that are the subject of the Agreement, the University and BSP desire to amend the Agreement by this Sixth Amendment to modify, among other things, various provisions of [the] Agreement regarding the consideration to be provided to the University in exchange for the Multi-Media Rights granted to BSP under the Agreement." (emphasis added)

The circumstances which required an adjustment to the Guaranteed Rights Fee in 2020-21 remain with respect to 2021-22, namely "the multi-media revenue streams" flowing from the Multi-Media Rights continue to be negatively impacted as a result of COVID-19 and Fresno State all but shutting down its athletic programs in 2020-21 and the uncertainty regarding 2021-22.

It cannot be reasonably disputed that Fresno State failed to meet the Assumptions in 2020-21 (and to a lesser extent 2021-22) in that (1) the inventory available to BSP for sponsorships was less than what was

available for the 2007-08 Athletic Year and (2) not all of the exclusive rights granted to BSP under the Agreement were available to BSP in 2020-21. Under such circumstances, Section 4.1 requires that the Guaranteed Rights Fee be "adjusted downward on a dollar-for-dollar basis" based on the resulting impact to BSP's revenue. And this adjustment is not limited to the Athletic Year in which the impairment first occurred; it applies to any Athletic year in which there is a revenue impact. The reduction in the Guaranteed Rights Fee that BSP paid with respect to 2021-22 is not a breach of the Agreement, <u>it was an adjustment that was contractually required under Section 4.1.</u>

With respect to the assertion in your letter that "the parties had already taken into account COVID-19 impacts for all subsequent contract years when they agreed, in the Sixth Amendment, to a substantial reduction in the Guaranteed Rights Fee" for 2020-21, that is false. I direct you to the actual language of the Sixth Amendment. Article V of the Sixth Amendment specifically provides as follows:

> "The parties agree that the parties' agreement on an adjustment for Athletic Year 2020-21 <u>shall not be deemed a waiver or release by BSP of its rights and remedies with respect to additional Athletic Years (under Section 4.3 or otherwise) as a result of the impact of COVID-19, all such rights and remedies are hereby expressly reserved.</u>" (emphasis added)

So, not only did the parties not intend the 2020-21 adjustment to the Guaranteed Rights Fee to satisfy the requirement to adjust subsequent Athletic Years, the parties specifically contemplated the opposite and BSP expressly reserved all rights and remedies with respect to required adjustments in subsequent Athletic Years.

Finally, in your letter you raise the fact that BSP acquired some new sponsors in 2022 as evidence that BSP was no longer impaired. I am not sure I understand how this is relevant. We do not dispute that we secured some new sponsors. However, these new sponsors were not enough to offset the sponsors (and revenue) lost as a result of the COVID-19 impairment.

Based on the foregoing it is clear that BSP has not breached the Agreement and Fresno State has no right to terminate under Section 6.4 or otherwise. Should Fresno State nonetheless attempt to terminate the Agreement, it will be a material breach and BSP will seek damages. I expect these damages to be significant.

The COVID-19 global pandemic upended the sports and live events industries. Learfield has had great success working with all our collegiate multi-media rights partners to adjust the financial terms of our deals on a multi-year basis to address the ongoing impact on our business. In this respect Fresno State's approach of demanding full payment and refusing to negotiate an adjustment has been an outlier. Obviously, it is disappointing that this is how Fresno State has decided to treat a long-term partner.

Fresno State's refusal to even entertain good faith discussions regarding ongoing impairment is evidenced by our most recent interactions. On August 18, 2022, you, Debbie Adishian-Astone and I had a telephone conversation in which I explained the financial damage to the business and you asked that we provide financial support showing this ongoing impairment. On August 26, 2022, I provided that information and asked that we "reconnect after you have had a chance to review." Despite this request, we did not hear from the University again until October 3, 2022, and then it was not the University reaching out in an attempt to find an amicable resolution or even engage in good faith discussions, it was a legal letter demanding payment in full and purporting to terminate the Agreement.

Jeffrey Adams
October 19, 2022
Page 2

Notwithstanding the foregoing, we once again request that Fresno State consider entering into good faith discussions to reach an amicable resolution. I am confident that if both parties approach these discussions in good faith, we can reach a resolution as we have with dozens and dozens of our other multi-media rights partners. If Fresno State remains unwilling to even entertain these discussions, the parties will be forced to litigate. Obviously, that is not something we want but should it come to that, we intend to vigorously pursue our rights and remedies.

This letter is being sent without prejudice and is not intended to waive any rights or remedies BSP may have under the Agreement or otherwise, all of which are hereby expressly reserved.

I look forward to hearing whether the University is willing to engage in good faith discussions in an attempt to resolve this matter.

Sincerely,

John H. Raleigh

# EXHIBIT H

# ArentFox Schiff

**ArentFox Schiff LLP**

555 West Fifth Street
48th Floor
Los Angeles, CA 90013

213.629.7400   **MAIN**
213.629.7401   **FAX**

afslaw.com

November 1, 2022

VIA EMAIL

John H. Raleigh (jraleigh@learfield.com)
Chief Legal Officer
Learfield
2400 Dallas Parkway, Suite 500
Plano, TX 75093

**Jerrold Abeles**
Partner
213.629.7407   **DIRECT**
jerry.abeles@afslaw.com

Re:    Notice of Termination for Cause

Dear Mr. Raleigh:

Thank you for your October 19, 2022 letter. Unfortunately, your letter did little to address the specific reasons that we provided in our October 3, 2022 Notice of Termination. Instead, among other issues, Learfield ignored those portions of the Sixth Amendment to the Contract that preclude the unilateral withholding of $1,020,000, as Learfield did.

You suggest that Fresno State and Learfield should engage in "good faith discussions." Had Learfield initiated discussions prior to taking $1,020,000 from Fresno State, perhaps this issue would have been avoided. Should Learfield now wish to discuss this matter, Fresno State insists on certain ground rules. First, the cure period for the Notice of Termination will continue to run and will not be extended. Second, Learfield needs to propose how it will provide Fresno State with $1,020,000 in value to make up for the funds that it unilaterally withheld without warning or legal basis. This includes a specific dollar amount that Learfield will pay towards the $1,020,000 shortfall in the amount due in June 2022 and any other value that Learfield proposes to provide. Third, based on Learfield's recent correspondence, which makes clear that Learfield intends to withhold additional "guaranteed" payments in the future, Learfield will need to confirm that it will not make any future unilateral deductions to the Guaranteed Rights Fee for the balance of the Contract, including from the December 2022 payment.

If Learfield does not accept these conditions by November 15, 2022, there is no reason for the parties to expend time or funds on future discussions or mediation. Please advise as to how Learfield wishes to proceed.

Yours truly,

*Jerrold Abeles*

Jerrold Abeles

**Smart In
Your World®**

# EXHIBIT I

| | |
|---|---|
| **From:** | John Raleigh <jraleigh@learfield.com> |
| **Sent:** | Tuesday, November 1, 2022 12:30 PM |
| **To:** | Abeles, Jerry |
| **Subject:** | RE: [EXT] Fresno State - Notice of Termination |

Jerry – Your letter is disappointing. We would have hoped that Fresno State would be willing, as a good partner, to engage in discussions regarding the appropriate manner for the parties to address the continuing impact of COVID-19 (and the associated shut-down of Fresno State's athletic programs) on the University's multi-media rights. This is how we have approached this with all of our other MMR partners. However, my understanding from your letter is that the University is only willing to consider having these discussions if Learfield meets certain new preconditions (new "ground rules") that are not found anywhere in our Agreement.

In response to the specific demands in your letter:

1. <u>Cure Period</u> – There has been no breach of the Agreement by Learfield, so there is nothing to cure. The Agreement provides for a dollar-for-dollar reduction in the rights fee to reflect the continuing impact of the University's failure to provide the required inventory. We are willing to discuss this reduction, but the fact the reduction happed in accordance with the terms of the Agreement is not a breach.
2. <u>Provider Additional Value</u> – We do not understand this demand. The amount withheld from the rights fee reflects the adverse impact on Learfield's business. It is not clear why Learfield would need to provide additional "value" to the University in an amount equal to the damages Learfield incurred from the University's inability to provide inventory to Learfield.
3. <u>Confirmation that there will not be Additional Reductions to the Rights Fee</u> – Any adjustment to the rights fee is simply a function of whether COVID impairment continues to impact the business. We certainly hope the business can get back to where it would have been absent the COVID shutdown and a result there would be no need for any additional adjustments. We are working hard to get the business back to where it would have been absent COVID and are optimistic about the future.

I hope the foregoing clarifies Learfield's position. We remain ready and willing to engage in discussions with the University about the appropriate adjustment to the FY22 rights fee and any alternatives the parties can agree to in lieu of a rights fee deduction or to help mitigate the impact to the business. The agreements we have reached with our other MMR partners have taken many forms, so we can be creative in finding a resolution at Fresno State.

I would ask that you consider having the business people sit down and attempt to talk through the issues. We are happy to come to Fresno to meet in person. I think that will be more productive than continuing to communicate through legal letters. We are confident that the parties can reach agreement if both parties are willing to engage.

I look forward to hearing from you.

Regards,
John

**From:** Abeles, Jerry <jerry.abeles@afslaw.com>
**Sent:** Tuesday, November 1, 2022 1:46 PM

**To:** John Raleigh <jraleigh@learfield.com>
**Subject:** RE: [EXT] Fresno State - Notice of Termination

John, please see the attached letter. Thank you.

 **Jerry Abeles**
PARTNER | ARENTFOX SCHIFF LLP
(HE/HIM/HIS)

jerry.abeles@afslaw.com | 213.629.7407 **DIRECT**
Bio | My LinkedIn | Subscribe
555 West Fifth Street, 48th Floor, Los Angeles, CA 90013

---

**From:** John Raleigh <jraleigh@learfield.com>
**Sent:** Wednesday, October 19, 2022 10:06 AM
**To:** Abeles, Jerry <Jerry.Abeles@arentfox.com>
**Subject:** RE: [EXT] Fresno State - Notice of Termination

Jerry — Please see the attached response to your letter.

Kind regards,

**John H. Raleigh**
*Chief Legal Officer*
2400 Dallas Parkway, Suite 500 | Plano, TX 75093
**O:** 469-241-9191 Ext. 1862
**M:** 216-659-7932

 **LEARFIELD**

---

**From:** Abeles, Jerry <jerry.abeles@afslaw.com>
**Sent:** Monday, October 3, 2022 1:23 PM
**To:** John Raleigh <jraleigh@learfield.com>; gbrown@learfield.com; phil@kaiserlawfirm.com
**Subject:** [EXT] Fresno State - Notice of Termination

Gentlemen, please see the attached notice.

 **Jerry Abeles**
PARTNER | ARENTFOX SCHIFF LLP
(HE/HIM/HIS)

jerry.abeles@afslaw.com | 213.629.7407 **DIRECT**
Bio | My LinkedIn | Subscribe
555 West Fifth Street, 48th Floor, Los Angeles, CA 90013

---

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error,

2

please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

CONFIDENTIALITY NOTICE: This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. We do not waive attorney-client or work product privilege by the transmission of this message.

3

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jerrold Abeles (SBN 138464) Jessica B. Do (SBN 317517)<br>ARENTFOX SCHIFF LLP<br>555 West Fifth Street, 48th Floor, Los Angeles, CA 90013<br>TELEPHONE NO.: 213 629-7400   FAX NO. (Optional): 213 629 7401<br>E-MAIL ADDRESS: jerry.abeles@afslaw.com; jessica.do@afslaw.com<br>ATTORNEY FOR (Name): Plaintiff California State Univ, Fresno Athletic Corporation | E-FILED<br>3/1/2023 12:11 PM<br>Superior Court of California<br>County of Fresno<br>By: April Hoffman, Deputy |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**
STREET ADDRESS: 1130 O. Street
MAILING ADDRESS: Same
CITY AND ZIP CODE: Fresno, CA  93721-2220
BRANCH NAME: B.F. Sisk Courthouse

CASE NAME: California State Univ, Fresno Athletic Corp v. Bulldog Sports Props

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 23CECG00768 |
| | | | JUDGE: | |
| | | | DEPT.: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| ☐ Auto (22)<br>☐ Uninsured motorist (46) | ☒ Breach of contract/warranty (06)<br>☐ Rule 3.740 collections (09) | ☐ Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property<br>Damage/Wrongful Death) Tort** | ☐ Other collections (09)<br>☐ Insurance coverage (18) | ☐ Construction defect (10)<br>☐ Mass tort (40) |
| ☐ Asbestos (04)<br>☐ Product liability (24) | ☐ Other contract (37) | ☐ Securities litigation (28)<br>☐ Environmental/Toxic tort (30) |
| ☐ Medical malpractice (45)<br>☐ Other PI/PD/WD (23) | **Real Property**<br>☐ Eminent domain/Inverse<br>condemnation (14) | ☐ Insurance coverage claims arising from the<br>above listed provisionally complex case<br>types (41) |
| **Non-PI/PD/WD (Other) Tort** | ☐ Wrongful eviction (33) | **Enforcement of Judgment** |
| ☐ Business tort/unfair business practice (07)<br>☐ Civil rights (08) | ☐ Other real property (26) | ☐ Enforcement of judgment (20) |
| ☐ Defamation (13) | **Unlawful Detainer**<br>☐ Commercial (31) | **Miscellaneous Civil Complaint** |
| ☐ Fraud (16)<br>☐ Intellectual property (19) | ☐ Residential (32)<br>☐ Drugs (38) | ☐ RICO (27)<br>☐ Other complaint (not specified above) (42) |
| ☐ Professional negligence (25)<br>☐ Other non-PI/PD/WD tort (35) | **Judicial Review**<br>☐ Asset forfeiture (05) | **Miscellaneous Civil Petition** |
| **Employment** | ☐ Petition re: arbitration award (11) | ☐ Partnership and corporate governance (21) |
| ☐ Wrongful termination (36)<br>☐ Other employment (15) | ☐ Writ of mandate (02)<br>☐ Other judicial review (39) | ☐ Other petition (not specified above) (43) |

2. This case ☐ is   ☒ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more
      issues that will be time-consuming to resolve          courts in other counties, states, or countries, or in a federal
   c. ☐ Substantial amount of documentary evidence            court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐   punitive
4. Number of causes of action (specify): 2
5. This case ☐ is   ☒ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: March 1, 2023

Jerrold Abeles                                    ► Jerrold Abeles
_____                 _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

CM-010 [Rev. September 1, 2021]                   **CIVIL CASE COVER SHEET**                   Page 2 of 2

Case 3:23-cv-00549-ADA-SKO Document 1 Filed 04/07/23 Page 108 of 109

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
    Auto (22)–Personal Injury/Property
        Damage/Wrongful Death
    Uninsured Motorist (46) *(if the*
        *case involves an uninsured*
        *motorist claim subject to*
        *arbitration, check this item*
        *instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**

    Asbestos (04)
        Asbestos Property Damage
        Asbestos Personal Injury/
            Wrongful Death
    Product Liability *(not asbestos or*
        *toxic/environmental)* (24)
    Medical Malpractice (45)
        Medical Malpractice–
            Physicians & Surgeons
        Other Professional Health Care
            Malpractice
    Other PI/PD/WD (23)
        Premises Liability (e.g., slip
            and fall)
        Intentional Bodily Injury/PD/WD
            (e.g., assault, vandalism)
        Intentional Infliction of
            Emotional Distress
        Negligent Infliction of
            Emotional Distress
        Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
    Business Tort/Unfair Business
        Practice (07)
    Civil Rights (e.g., discrimination,
        false arrest) *(not civil*
        *harassment)* (08)
    Defamation (e.g., slander, libel)
        (13)
    Fraud (16)
    Intellectual Property (19)
    Professional Negligence (25)
        Legal Malpractice
        Other Professional Malpractice
        *(not medical or legal)*
    Other Non-PI/PD/WD Tort (35)
**Employment**
    Wrongful Termination (36)
    Other Employment (15)

**Contract**
    Breach of Contract/Warranty (06)
        Breach of Rental/Lease
            Contract *(not unlawful detainer*
             *or wrongful eviction)*
        Contract/Warranty Breach–Seller
            Plaintiff *(not fraud or negligence)*
        Negligent Breach of Contract/
            Warranty
        Other Breach of Contract/Warranty
    Collections (e.g., money owed, open
        book accounts) (09)
        Collection Case–Seller Plaintiff
        Other Promissory Note/Collections
            Case
    Insurance Coverage *(not provisionally*
        *complex)* (18)
        Auto Subrogation
        Other Coverage
    Other Contract (37)
        Contractual Fraud
        Other Contract Dispute

**Real Property**
    Eminent Domain/Inverse
        Condemnation (14)
    Wrongful Eviction (33)
    Other Real Property (e.g., quiet title) (26)
        Writ of Possession of Real Property
        Mortgage Foreclosure
        Quiet Title
        Other Real Property *(not eminent*
        *domain, landlord/tenant, or*
        *foreclosure)*

**Unlawful Detainer**
    Commercial (31)
    Residential (32)
    Drugs (38) *(if the case involves illegal*
        *drugs, check this item; otherwise,*
        *report as Commercial or Residential)*
**Judicial Review**
    Asset Forfeiture (05)
    Petition Re: Arbitration Award (11)
    Writ of Mandate (02)
        Writ–Administrative Mandamus
        Writ–Mandamus on Limited Court
            Case Matter
        Writ–Other Limited Court Case
            Review
    Other Judicial Review (39)
        Review of Health Officer Order
        Notice of Appeal–Labor
            Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
    Antitrust/Trade Regulation (03)
    Construction Defect (10)
    Claims Involving Mass Tort (40)
    Securities Litigation (28)
    Environmental/Toxic Tort (30)
    Insurance Coverage Claims
        *(arising from provisionally complex*
        *case type listed above)* (41)
**Enforcement of Judgment**
    Enforcement of Judgment (20)
        Abstract of Judgment (Out of
            County)
        Confession of Judgment *(non-*
        *domestic relations)*
        Sister State Judgment
        Administrative Agency Award
        *(not unpaid taxes)*
        Petition/Certification of Entry of
            Judgment on Unpaid Taxes
        Other Enforcement of Judgment
            Case
**Miscellaneous Civil Complaint**
    RICO (27)
    Other Complaint *(not specified*
        *above)* (42)
        Declaratory Relief Only
        Injunctive Relief Only *(non-*
        *harassment)*
        Mechanics Lien
        Other Commercial Complaint
            Case *(non-tort/non-complex)*
        Other Civil Complaint
            *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
    Partnership and Corporate
        Governance (21)
    Other Petition *(not specified*
        *above)* (43)
        Civil Harassment
        Workplace Violence
        Elder/Dependent Adult
            Abuse
        Election Contest
        Petition for Name Change
        Petition for Relief From Late
            Claim
        Other Civil Petition

**SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO**
**Civil Unlimited Department,** Central Division
1130 "O" Street
Fresno, California 93724-0002
**(559) 457-1900**

FOR COURT USE ONLY

3/3/2023

**Filed by Court**

TITLE OF CASE:

The California State University, Fresno Athletic Corporation vs. Bulldog Sports Properties, LLC

| NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF JUDGE FOR ALL PURPOSES | CASE NUMBER: 23CECG00768 |
|---|---|

**To All Parties and their Attorneys of Record:**
Jerrold Abeles
Arentfox Schiff LLP
555 West Fifth Street 48th Floor
Los Angeles CA 90013

This case has been assigned to **D Tyler Tharpe,** Judge for **all purposes.**
All future hearings will be scheduled before this assigned judge, in **Department 501**

You are required to appear at a Case Management Conference on **06/29/2023** at **3:30 PM** in **Department 402** of the Court located at 1130 "O" Street, **Fresno, California.**

You must comply with the requirements set forth in the Superior Court of Fresno County, Local Rules, Chapter 2.

Failure to appear at the conference may result in imposition of sanctions, waiver of jury trial, or other adverse consequences.

**Defendants:** Appearance at the Case Management Conference does not excuse you from having to file your response in proper legal form within 30 days after the summons is served on you. Failure to file a response in a timely manner may result in adverse consequences, including a default judgment being entered against you. If you do not have an attorney and wish to retain one, there are attorney referral services, legal aid offices, and private practice attorneys in the Fresno area (most may be found on the internet or the local phone book).

---

### DECLARATION

I declare under penalty of perjury under the laws of the State of California that I gave a copy of the **Notice of Case Management and Assignment of Judge for All Purposes** to the person who presented this case for filing.

Date: **3/3/2023** _____ Clerk, by **April Hoffman** _____ , Deputy

---

CV-48 R07-21                    NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF JUDGE
                                                     FOR ALL PURPOSES
OPTIONAL